# IN THE SUPREME COURT OF TEXAS

════════════

No. 13-0597

════════════

PLAINS EXPLORATION & PRODUCTION COMPANY, PETITIONER,

v.

TORCH ENERGY ADVISORS INCORPORATED, RESPONDENT

════════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

════════════════════════════════════════════════════════

**Argued February 24, 2015**

JUSTICE GUZMAN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE WILLET, JUSTICE LEHRMANN, JUSTICE BOYD, JUSTICE DEVINE and JUSTICE BROWN joined.

JUSTICE JOHNSON filed a dissenting opinion.

This conventional contract-interpretation dispute is set against the backdrop of a complex regulatory regime governing exploration and development of oil and gas reserves in lands under federal waters. At issue is the proper construction of a 1996 purchase and sale agreement in which Torch Energy Advisors Inc. sold its leasehold interests in undeveloped oil and gas fields located outside territorial waters off the coast of California. Certain tangible and intangible interests were excluded from the conveyance on terms described in the purchase and sale agreement. More than a decade later, a federal court determined that the federal government had repudiated the mineral leases because a statute enacted several years before the conveyance had later been applied in a

manner that precluded development of the leasehold interests. As a result, the purchaser's successor in interest, Plains Exploration & Production Company, was awarded restitution of the lease-bonus payments Torch's predecessor had paid to secure the leases. Although not a party to the litigation, Torch claimed an ownership interest in roughly half the judgment based on the terms of the excluded-assets provision in the 1996 agreement. When Plains declined to pay, Torch sued, alleging various contract, tort, and equitable theories of recovery.

Following a take-nothing summary judgment in Plains's favor, Torch appealed. With the issues reduced to contract and equitable theories, the court of appeals held that, as a matter of law, no valid breach-of-contract claim existed because any interest in the proceeds of the judgment had either been conveyed to Plains or had been excluded from the 1996 conveyance. 409 S.W.3d 46, 52 (Tex. App.—Houston [1st Dist.] 2013). Though foreclosing any claim under the contract, the court nevertheless concluded that Torch's equitable claim hinged on the proper construction of the 1996 agreement's terms. *Id.* at 53. According to the court, Torch might have a viable equitable claim for "money had and received" if Plains had failed to turn over an excluded asset, a matter which it said depended on the meaning of ambiguous contract provisions. *Id.* at 55-59. The court therefore reversed the trial court's judgment in part and remanded the equity claim for a trial on the merits.

We hold that the relevant excluded-assets provisions in the 1996 purchase and sale agreement are unambiguous and, as a matter of law, Torch did not retain ownership of the claimed asset. We therefore reverse the court of appeals' judgment and render judgment that Torch take nothing on its claims against Plains.

## I. Background

Between 1968 and 1984, dozens of private energy companies paid more than a billion dollars in up-front bonuses to secure mineral leases in land submerged under federal waters off the California coast; Dr. Burdette A. Ogle obtained twenty-three leases during that period (the Ogle leases). All of the leases were in oil and gas fields in the Pacific outer continental shelf (OCS leases) and carried five-year primary terms.[1] Expiration of the leases could be delayed either at the lessee's request (requested suspension) or at the direction of the Department of Interior's Mineral Management Service (directed suspension). During a requested suspension, a lessee could continue exploratory and development activities, but no activities were permitted during a directed suspension.

Because the OCS leases were in federal waters, all exploration, development, and production activities were subject to regulation under federal statutes, including the Coastal Zone Management Act (the CZMA), which was originally enacted in 1972. 16 U.S.C. §§ 1451-66. Under the CZMA, a coastal state may develop its own federally approved coastal management plan, and once adopted, federal agencies must act consistently with that plan. *Id.* §§ 1454, 1455. The CZMA thus gives coastal states a seat at the regulatory table with regard to activity occurring in the waters off their shorelines.

---

[1] "[T]he federal government has jurisdiction and control over the outer continental shelf, which is defined as including all submerged land that is beyond the outer limits of state jurisdiction (ordinarily three nautical miles from shore) and within the limits of national jurisdiction (ordinarily 200 miles from shore)." *Amber Res. Co. v. United States*, 538 F.3d 1358, 1362 (Fed. Cir. 2008) (citing 43 U.S.C. §§ 1301, 1331(a), 1332).

In the wake of legal action challenging the scope of the CZMA, Congress amended the statute in 1990 to require the federal government to make a determination as to consistency with a state's coastal management plan and to provide that determination to the relevant state agency before granting final approval of an "activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone." *Id.* § 1456(c)(1)(A), (C). The 1990 amendment broadened the CZMA's scope by requiring consistency determinations for "each activity" affecting the coastal zone rather than limiting such determinations to activities "directly affecting" coastal zones, as the prior enactment had required. A state objecting to a federal consistency determination could sue to enjoin the objectionable activity, and if it prevailed, the activity could commence only by presidential override and only in limited circumstances. *Id.* § 1456(c)(1)(B).

Following the 1990 CZMA amendment, it was generally accepted that a consistency determination was required before any new lease could be granted. The Mineral Management Service, however, did not apply the CZMA's consistency-determination requirement to lease suspensions. Consequently, for years after the 1990 CZMA amendment, the Mineral Management Service repeatedly extended the Ogle leases through a series of requested and directed suspensions without conducting any consistency determinations.

The most lengthy suspension began in January 1993 when the Mineral Management Service directed suspensions of all the OCS leases to conduct the California Offshore Oil and Gas Energy Resources (COOGER) study. The study, which was substantially funded by the lessees, was designed to develop information about activities on the leased property that would aid the Mineral

4

Management Service in its functions and would be shared with governmental entities in California. The study was expected to be completed within three years.

In August 1993, Ogle wrote a report concerning the viability of future development of the leases in which he foresaw "no significant problem" with future permitting and expressed optimism that the results of the COOGER study might "make for smoother relations" going forward. Although state and local opposition could be anticipated, he observed that recent Supreme Court takings decisions and the threat of litigation against cash-strapped governmental entities would ameliorate the risk that development of the leasehold interests would be halted.

Amidst this evolving regulatory environment, Torch executed a purchase and sale agreement (PSA) with Ogle in July 1994, by which it acquired all of Ogle's interests in the OCS leases and related property and contracts. Torch agreed to pay Ogle $1 million at closing along with an anniversary payment of $1 million, $500,000 annually thereafter, and $40 million out of any production at the rate of 3%. Torch contends that Ogle reserved no interests or rights in the properties following this conveyance. In December 1994, Torch assigned 50% of what it had acquired from Ogle to Nuevo Energy Company, an entity Torch had created and whose acquisitions Torch managed.[2] Torch states it received no consideration for this transaction beyond the hope of a continued relationship managing Nuevo's assets. Torch did not reserve any rights or exclude any assets in the 1994 assignment to Nuevo. Shortly thereafter, Torch acquired from Ogle a 40% ownership interest in five other leases.

_____

[2] According to Torch's CEO, Torch formed Nuevo in 1990 through a roll-up of several private and public partnerships. During the relevant time period, Torch and Nuevo shared offices and legal counsel and had overlapping officers.

5

None of the foregoing transactions are at issue in this proceeding.

Rather, the genesis of the underlying dispute is a separate transaction in which Torch conveyed its remaining 50% interest in the Ogle leases to Nuevo. Under the terms of a PSA Torch and Nuevo executed in April 1996 (the 1996 PSA), Nuevo acquired Torch's remaining interest in the Ogle leases along with other property interests and related assets, and Torch acquired $42 million in Nuevo stock. The 1996 PSA collectively conveyed Torch's residual interests in the Ogle leases (which were nonproducing) and other mineral leases (including producing properties) to Nuevo.[3] Not all related rights and interests were included in the conveyance to Nuevo, however. Torch expressly retained ownership of certain tangible and intangible rights identified and described in a provision of the contract entitled "Excluded Assets."

The laundry list of excluded tangible assets included mundane items such as personal computers and radio and telephone equipment. At issue in this case are categories of excluded intangible assets described generally as claims and causes of action "arising" or "attributable to periods of time" before the contract's stated effective date of October 1, 1995, and all revenue "attributable" to the conveyed property for any period before the contract effective date. The crux of this appeal is the scope of the excluded-assets provision as it pertains to damages awarded in litigation Nuevo subsequently initiated against the federal government alleging repudiation of the Ogle leases.

---

[3] Although the parties dispute whether Torch received any consideration for the Ogle leases per se, the purchase price was not specifically allocated to any particular property.

6

In 1998, a few years before suing the federal government, Nuevo began investigating the "remote possibility" that the Mineral Management Service would be willing to repurchase the Ogle leases based on contemporaneous newspaper reports that California legislators were seeking to ban drilling under federal leases off the coast of California. Nuevo requested a legal opinion on the feasibility of a buy-back transaction and inquired whether Ogle would share in any buy-back proceeds under the terms of the original lease conveyance to Torch. Nuevo asked counsel to investigate the Mineral Management Service's buy-back history concerning leasehold interests in other OCS regions, specifically the eastern Gulf of Mexico and the Atlantic.

In response to Nuevo's request, legal counsel advised Nuevo about litigation and settlements related to leasehold interests in waters off the coast of Alaska, Southwest Florida, and North Carolina that had occurred between 1992 and 1997 (some of which continued long afterward) under statutory schemes regulating activities in those regions. *See, e.g.*, *Conoco Inc. v. United States*, 35 Fed. Cl. 309 (1996), *rev'd*, *Marathon Oil Co. v. United States*, 177 F.3d 1331 (Fed. Cir. 1999), *rev'd*, *Mobil Oil Exploration & Producing S.E., Inc. v. United States*, 530 U.S. 604 (2000) (breach-of-contract action originally initiated in 1992 by various lessees with leasehold interests in the Atlantic OCS alleging that the subsequently enacted Outer Banks Protection Act prevented the government from complying with the regulatory scheme incorporated by reference into the mineral leases). Legal counsel also advised Nuevo that Ogle had retained no interest in any potential buy-back proceeds; in an affidavit prepared for this litigation, counsel stated that no inquiry or analysis had been made as to whether Torch retained such an interest.

In relatively short order thereafter, a series of events occurred that precipitated the OCS lessees, including Nuevo, filing suit against the federal government in 2002 for breaching the lease agreements. In 1999, the COOGER-related directed suspensions were lifted; the Mineral Management Service granted requested suspensions for most of the OCS leases without conducting consistency determinations; and the State of California filed a legal challenge to the Mineral Management Service's authority to grant lease suspensions without performing the consistency determination required by the 1990 CZMA amendment. In 2001, California prevailed in the litigation, which was affirmed on appeal in 2002, and the Mineral Management Service was compelled by court order to conduct consistency determinations before granting any lease suspensions. *See California v. Norton*, 150 F. Supp. 2d 1046, 1053 (N.D. Cal. 2001) (*Norton I*), *aff'd,* 311 F.3d 1162 (9th Cir. 2002) (*Norton II*). The injunction issued in *Norton I* eventually made development of the leases effectively impossible.

In 2002, Nuevo and the other OCS lessees sued the federal government in the Court of Federal Claims, asserting that application of the 1990 CZMA amendment to their leases breached the leases, entitling them to rescission and restitution of bonus payments and sunk costs. The parties refer to that lawsuit as the *Amber* litigation after the name of the lead plaintiff. While the lawsuit was pending, Plains acquired the Ogle leasehold interests via merger with Nuevo and succeeded to its interest in the Ogle leases under the 1996 PSA.

In *Amber*, the Court of Federal Claims and the Federal Circuit court agreed that the United States government had repudiated the OCS leases and that the lessees were entitled to restitution of the up-front bonuses paid for the leases. *See Amber Res. Co. v. United States*, 68 Fed. Cl. 535, 560

(2005) (*Amber I*), *aff'd*, 538 F.3d 1358 (Fed. Cir. 2008) (*Amber II*). Importantly, in determining whether and when such repudiation occurred, the circuit court held that enactment of the 1990 CZMA amendments did not constitute repudiation of the lease agreements because the government and the lessees operated for several years on the assumption that the 1990 amendment did not apply to lease suspensions. *Amber II*, 538 F.3d at 1369. Instead, the court held that governmental repudiation occurred in 2001 when the injunction was issued in *Norton I* because that "was the first time the 1990 CZMA amendments had any effect on the parties' performance under the lease agreements." *Id.* The court affirmed the judgment ordering the United States to pay $1.1 billion in restitution for the original lease-bonus payments. Plains's share of the judgment on the Ogle leases was more than $83 million.

Following Plains's victory, Torch, who had not participated in the lawsuit, claimed that it was entitled to more than half of the bonuses refunded to Plains (plus interest) under the "Excluded Assets" clause in the 1996 PSA (roughly $44 million). Torch claimed no interest in the restitution award attributable to the 1994 assignment, because the assignment did not exclude any assets from the conveyance of Torch's interests to Nuevo.

When Plains did not pay, Torch sued Plains, asserting a variety of contract, tort, and equitable theories. Plains asserted several affirmative defenses in response. With very little in dispute factually, the parties filed cross motions for traditional and no-evidence summary judgment on all claims and defenses. The trial court denied each party's motion in part and granted each motion in part. Ultimately, the trial court rendered a take-nothing judgment in Plains's favor on all of Torch's claims. Substantively, the court determined that Plains conclusively established that the economic-

loss rule barred all the non-contract claims and that Torch did not retain rights to any interest in the proceeds of the restitution judgment under the 1996 PSA. Although not affecting the ultimate disposition, the court also granted Torch's no-evidence motion for summary judgment on Plains's statute-of-limitations, laches, and unclean-hands defenses. The court's interlocutory summary-judgment order was made final by a subsequent order of dismissal without prejudice on Plains's request for attorney's fees under the Uniform Declaratory Judgments Act.

Torch appealed, asserting that (1) the proceeds of the *Amber* lawsuit are an "Excluded Asset" under the 1996 PSA as a matter of law and, in the alternative, (2) the trial court erroneously applied the economic-loss rule to bar Torch's equitable claim for money had and received. As to the first issue, the court of appeals affirmed summary judgment on the breach-of-contract claim, holding that the right to restitution of the bonus payments was either conveyed to Plains under the 1996 agreement or excluded from, and thus not the subject of, the contract. 409 S.W.3d at 52. Accordingly, breach of contract was impossible. *See id.* As to the second issue, the court held that (1) the economic-loss rule does not preclude recovery of an excluded asset under an equitable theory; (2) construction of the excluded-assets provision in the 1996 agreement is critical in determining whether Torch retained the disputed interest; and (3) the relevant contract provisions were ambiguous in numerous respects. *Id.* at 53-59. Accordingly, the court reversed summary judgment on the money-had-and-received claim and remanded the case for a trial in equity.[4] *Id.* at 59.

---

[4] A claim for "money had and received" is equitable in nature. *Stonebridge Life Ins. Co. v. Pitts*, 236 S.W.3d 201, 203 n.1 (Tex. 2007). "Money had and received is a category of general assumpsit to restore money where equity and good conscience require refund." *MGA Ins. Co. v. Charles R. Chesnutt, P.C.*, 358 S.W.3d 808, 813 (Tex. App.—Dallas 2012, no pet.). "A cause of action for money had and received is not premised on wrongdoing, but 'looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to

10

In cross petitions for review to this Court, the parties agree that Torch's claim is governed by principles of contract law, not equity, and that the 1996 agreement unambiguously determines who owns the disputed asset.

## II. Discussion

Though the parties and the court of appeals agree that the resolution of this dispute begins and ends with the express terms of the 1996 PSA, there is no consensus as to where that analysis leads. At the outset, we observe a number of uncontested factual and legal matters that focus our analysis exclusively on the 1996 PSA's excluded-assets provision:

- Ogle obtained the leases at issue and paid the lease-bonus payments.

- Ogle conveyed all of its interests in the leases to Torch.

- In the 1994 assignment, Torch conveyed 50% of its interest in the Ogle leases to Nuevo and claims no interest in the portion of the *Amber* judgment pertaining to that conveyance.

- Torch conveyed all of its remaining interest in the Ogle leases to Nuevo in the 1996 PSA except to the extent it reserved rights and interests in the excluded-assets provision of that contract.

- Plains is Nuevo's successor in interest under the 1996 PSA.

- Torch claims $44 million of the $83 million judgment Plains obtained in the *Amber* litigation based on contractual exclusions of certain claims, causes of action, proceeds, income, and revenue in the 1996 PSA.

---

another.'" *Id*. (quoting *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no writ)). "In short, it is an equitable doctrine applied to prevent unjust enrichment." *Id*. "To prove a claim for money had and received, a plaintiff must show that a defendant holds money which in equity and good conscience belongs to him." *Id*.

As the issues raised here require consideration of the relevant contract provisions, we begin our analysis there.

Section 1 of the 1996 "Agreement for Purchase and Sale" describes the pertinent conveyances and exclusions as follows:

1.    Sale and Purchase of the Properties. Subject to the terms and conditions and for the consideration herein set forth . . . [Torch] agrees to sell, assign, convey and deliver to [Plains], and [Plains] agrees to purchase and acquire . . . on October 1, 1995 (the "*Effective Date*"), all of the interest of [Torch] (unless otherwise noted) in and to the following properties, other than the Excluded Assets ("Properties"):

1.1.  The Properties.

1.1.1.  Oil and Gas Properties. All leasehold interests or operating rights in the oil and gas leases, other mineral interests and those fee simple interests described in Part I of the Exhibit (the "*Oil and Gas Properties*").

. . . .

1.1.7.  Contracts.  All contracts and arrangements that directly relate to the Properties and the operation, pooling, unitization, gas balancing, production, storage, treatment, transportation, processing, purchase, sale, disposal or other disposition of Substances therefrom and any and all amendments, ratifications or extensions of the foregoing, to the extent that any of the foregoing relate to periods on or after the Effective Date (the "*Contracts*"), and all rights to make claims and receive proceeds under any insurance policy held by or on behalf of [Torch] in connection with the Properties for any claim that arises from the Effective Date through the Closing Date in connection with the Properties.[5]

. . . .

1.2.  Excluded Assets. As used herein, "*Excluded Assets*" means . . . (b) all claims and causes of action of [Torch] (i) arising from acts, omissions or events, or

---

[5] Also included in section 1.1's description of "the Properties" conveyed are wells, severed substances, surface contracts, equipment, information and data, permits, emission credits, water rights, and royalty interests.

damage to or destruction of property, occurring prior to the Effective Date, (ii) arising under or with respect to any of the Contracts that are attributable to periods of time prior to the Effective Date (including claims for adjustments or refunds); . . . (g) all proceeds, income or revenues (and any security or other deposits made) attributable to (i) the Properties for any period prior to the Effective Date, or (ii) any Excluded Assets . . . .[6]

The specific excluded-assets provisions at issue include temporal divisions, reserving to Torch the described assets only to the extent they arise from or are attributable to periods before the contract's October 1, 1995 effective date. The *Amber* judgment, which is the asset at issue, indisputably arose from events after the contract's effective date. Specifically, the *Norton I* litigation spawned the *Amber* litigation in which the Federal Circuit court concluded that issuance of the *Norton I* injunction, not enactment of the 1990 CZMA amendment, caused the government to breach the Ogle leases. Torch contends, however, that events occurring before the contract's effective date also gave rise to the restitution claim and contributed to restitution of the up-front lease-bonus payments, specifically, payment of the bonuses in the first instance and enactment of the 1990 CZMA amendment.

The parties disagree about the proper construction of many of the terms in the relevant provisions, including whether the leases are only "Oil and Gas Properties" or are also "Contracts"; whether "claims and causes of action" refers to contingent and accrued claims or only the latter; and what type of relationship or connection is required to meet the "arising from," "arising under or with

___

[6] Other items excluded in section 1.2 include "all trade credits and all accounts, instruments and general intangibles . . . attributable to the Properties with respect to any period of time prior to the Effective Date"; insurance, indemnity, bond and condemnation rights, interests or awards arising from acts, omissions or damages "solely occurring prior to the Effective Date"; "all personal computers and associated peripherals and all radio and telephone equipment"; all of Torch's intellectual property; and all of Torch's documents and instruments protected by attorney-client privilege.

13

respect to," and "attributable to" requirements tied to the temporal limitations in the excluded-assets provision. Although the interpretation of the contract is of central—indeed, controlling—importance in ascertaining the parties' rights with respect to the *Amber* judgment, the court of appeals concluded that Torch's claim is in the nature of equity, not contract. The parties are in agreement that this was error, but we do not reach the issue because we conclude that Torch did not retain ownership of the disputed asset.

### A. Standard of Review

Absent ambiguity, contracts are construed as a matter of law. *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014). In construing a written contract, our primary objective is to ascertain the parties' true intentions as expressed in the language they chose. *Id.* We "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served," and avoiding unreasonable constructions when possible and proper. *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987). To that end, we consider the entire writing, harmonizing and giving effect to all the contract provisions so that none will be rendered meaningless. *Moayedi*, 438 S.W.3d at 7. No single provision taken alone is given controlling effect; rather, each must be considered in the context of the instrument as a whole. *Id.* We also give words their plain, common, or generally accepted meaning unless the contract shows that the parties used words in a technical or different sense. *Id.*

A contract is not ambiguous if the contract's language can be given a certain or definite meaning. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012). But if the contract is subject to two or more reasonable interpretations after applying the pertinent

construction principles, the contract is ambiguous, creating a fact issue regarding the parties' intent. *Id.* Summary judgment is not the proper vehicle for resolving disputes about an ambiguous contract. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215-16 (Tex. 2003) (summary judgment is proper if no genuine issue of material fact exists).

While extrinsic evidence of the parties' intent is not admissible to create an ambiguity, the contract may be read in light of the circumstances surrounding its execution to determine whether an ambiguity exists. *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998). Consideration of the surrounding facts and circumstances is simply an aid in the construction of the contract's language and has its limits. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981). The rule that extrinsic evidence is not admissible to create an ambiguity "'obtains even to the extent of prohibiting proof of circumstances surrounding the transaction when the instrument involved, by its terms, plainly and clearly discloses the intention of the parties, or is so worded that it is not fairly susceptible of more than one legal meaning or construction.'" *Id.* at 732 (quoting *Lewis v. E. Tex. Fin. Co.*, 146 S.W.2d 977, 980 (Tex. 1941)). Mere disagreement over the interpretation of an agreement does not necessarily render the contract ambiguous. *See City of Pasadena v. Gennedy*, 125 S.W.3d 687, 693 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

Before turning to the analysis of the relevant contract provisions, we review the environment in which the 1996 PSA came into existence and the contractual context in which the excluded-assets provision resides.

## B. Surrounding Circumstances

Four years before Torch obtained its interests from Ogle, the 1990 CZMA amendment was enacted. Neither the federal government nor the OCS lessees treated the amendment as applicable to the leases until long after Torch obtained and conveyed the leases to Nuevo. *See Amber II*, 538 F.3d at 1370 ("It would ignore the reality of the situation in this case to suggest that the interpretation of the 1990 CZMA amendments, as ultimately announced by the courts more than a decade later, was clear to the parties from the moment of enactment or that the governing principles of contract law should be applied as if it were. The fact of the matter is that, right or wrong, the parties interpreted the 1990 CZMA amendments in a way that would not have resulted in a breach."). In the 1994 assignment, Torch assigned half of its interest in the Ogle leases to Nuevo—an entity it created, shared officers and offices with, and with which it had an existing business relationship—for no consideration and without reserving any rights or interests. When Torch conveyed its remaining 50% interest in the Ogle leases to Nuevo in 1996, along with producing mineral leases and other property, Torch reserved certain interests described in the contract and received $42 million in Nuevo stock. The contract does not allocate the acquisition price among the various assets. The leases were not at that time, nor any time thereafter, developed into producing properties.

Although the 1996 PSA expressly reserves Torch's ownership of relatively inconsequential items like personal computers, telephones, and radios, there is no express reference in the contract to the CZMA or to bonuses of any kind, let alone the substantial bonuses that were paid to acquire the Ogle leases. Nor is there any mention of potential legal issues pertaining to the same. In comparison, several existing disputes are specifically referenced elsewhere in the contract. Other

16

than disclosed matters, Torch represented that there was "no claim, demand, filing, investigation, administrative proceeding, action, suit or other legal proceeding . . . pending or, to the best of [Torch's] knowledge, threatened, with respect to the Properties . . . ."

Torch nevertheless characterizes the 1996 conveyance of its interests in the Ogle leases as somewhat of a contingent gift to Nuevo (and derivatively, Plains) in which it conveyed the enormous potential upside of development for no consideration but did not similarly intend to gift any residual value if production were eventually thwarted under then-existing laws. There is no dispute that Torch conveyed all of its interests in the Ogle leases to Nuevo or that the conveyance included potentially billions of dollars worth of production if the oil and gas fields could be developed under the leases. Nor is there any dispute that Torch would have no interest in the production gains regardless of the initial acquisition costs for the leases. As Torch states in its brief:

> Production of those reserves was anticipated to generate such exponential monetary returns that the original payments made to secure the leases were minuscule by comparison. In assigning the leases and development rights to Plains, Torch surrendered any interest in the leases' hugely lucrative production potential.

(Internal citations omitted). Torch contends, however, that if the leases proved to be worthless, it intended to retain something of value; it did so by negotiating terms in the "Excluded Assets" provision of the PSA; and those provisions unambiguously encompass the restitution award Plains recovered in the *Amber* lawsuit.[7]

---

[7] Torch characterizes the restitution award as a "refund." "Restitution" is a measure of contract damages that are awarded to a plaintiff "based on the defendant's unjust enrichment." BLACK'S LAW DICTIONARY 1507 (10th ed. 2014); *see* RESTATEMENT (SECOND) OF CONTRACTS §§ 370-77 (1981). A "refund" is "[t]he return of money to a person who overpaid . . . ." BLACK'S LAW DICTIONARY at 1472. Because we resolve the dispute on other grounds, we need not consider whether any differences between the two concepts is materially significant to the contract's interpretation.

17

## C. Relevant Contract Provisions

In claiming a share of the *Amber* proceeds, Torch relies on the following exclusions from the description of the "Properties" conveyed in section 1 of the 1996 PSA:

Section 1.2(b)(i) & (ii): excluding "all claims and causes of action of [Torch]":

(i) "arising from acts omissions or events, or damage to or destruction of property, occurring prior to the Effective Date [of October 1, 1995]"; or

(ii) "arising under or with respect to any of the Contracts that are attributable to periods of time prior to the Effective Date (including claims for adjustments or refunds)."

Section 1.2(g)(i): excluding from the conveyance of "the Properties" "all proceeds, income or revenues (and any security or other deposits made) attributable to . . . the Properties for any period prior to the Effective Date."[8]

In Torch's view, these provisions reserve any future benefit of monies spent or actions taken pre-conveyance with respect to the leases, while the contract otherwise conveyed all future production benefits to Plains.

Here, the asset in question is the right to recover "the funds the plaintiffs or their predecessors-in-interest had paid in the form of upfront bonus payments as consideration for the rights associated with the offshore leases," which is a contract remedy emanating from the right to enforce the leases. *Amber Res. Co.*, 538 F.3d at 1367, 1379. There appears to be no dispute that the restitution claim did not accrue until after the effective date of the 1996 PSA. Rather, the parties

---

[8] Section 1.2(g)(ii), which Torch also relies on, excludes all receipts from "Excluded Assets," and is essentially derivative of section 1.2(b)(i) and (ii); accordingly, we need not independently analyze the applicability of this exclusion.

dispute whether the excluded-assets provision applies to unripe claims. The court of appeals determined that the term "claim" can refer to "contingent claims," including a claim based on the 1990 CZMA amendment that was unripe or unaccrued until after the contract's effective date. 409 S.W.3d at 58. But the court found the contract to be ambiguous "about whether contingent claims relating to and arising from [acts, omissions, and events] both before and after the effective date were excluded [and] whether proceeds attributable to both before and after the effective date were excluded." *Id*. at 59.

Although the parties dispute the meaning, scope, and intent of various constituent parts of the cited provisions,[9] the dispositive phrases, for purposes of our analysis, are "arising from," "arising under or with respect to," and "attributable to." Because none of these words are defined in the contract, they must be afforded their plain meaning, as constrained by their environment. Applying settled rules of contract interpretation, we conclude that these terms unambiguously require a pre-effective date causal nexus that does not exist in the present case.

### D. Ambiguity Analysis

The term "arise" has broad meaning and includes "to originate; to stem (from) . . . [t]o result (from)," BLACK'S LAW DICTIONARY 129 (10th ed. 2014), and "to originate from a specified source . . . to come into being . . . to become operative . . . to come about: come up: take place . . . to become apparent in such a way as to demand attention," WEBSTER'S THIRD NEW INT'L DICTIONARY

---

[9] For example, for purposes of applying the exclusion in section 1.2(b)(ii), the parties disagree about whether the Ogle leases are included only in the 1996 PSA's definition of "Oil and Gas Properties" or are also encompassed in the definition of "Contracts." Plains contends that the term "Contracts" does not refer to the leases themselves and instead applies only to contracts ancillary but directly related to the "Properties," a term that indisputably includes the leasehold interests.

19

117 (2002). "Respect" can mean "a relation to or concern with something [usually] specified . . . a relation or reference to a particular thing or situation . . . as regards: insofar as concerns: with reference to." *Id.* at 1934. "Attributable" is similarly broad, deriving from the term "attribute," meaning "to bestow as a right . . . to explain as caused or brought about by: regard as occurring in consequence of or on account of . . . ." *Id.* at 142. Each of these words, albeit broad, connote some causal nexus. *Cf. Lancer Ins. Co. v. Garcia Holiday Tours*, 345 S.W.3d 50, 54 (Tex. 2011) (observing no significant distinction between causal standard applicable to "arising out of" and "resulting from" language). However, the intended degree of connectedness is hotly contested by the parties.

Torch takes the position that the terms impose a relatedness requirement that is satisfied by a "but for" connection. If the contract can be interpreted to import the simple causal standard Torch advocates, the original bonus payments and the 1990 CZMA amendments certainly meet that standard; without those events, there would be no claim to make and thus no restitution judgment. As we have observed, "'a 'but for' requirement . . . has in itself no limiting principle; it literally embraces every event that hindsight can logically identify in the causative chain.'" *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 581 (Tex. 2007) (quoting *Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 715 (1st Cir. 1996)).

Because the "but for" causal standard is essentially limitless in its reach, Plains contends that a more direct relatedness standard was contemplated; otherwise, the temporally based divisions in the relevant portions of the excluded-assets provision would have no meaning. Plains advocates an interpretation adopting a "substantial factor" connection, limiting the excluded claims, causes of

20

action, and receipts to acts or events that actually produced the *Amber* judgment. *See Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 770 (Tex. 2007).

We have embraced the breadth and potential ambiguity of the same or similar types of words in contract cases involving insurance policies and arbitration clauses, suggesting a "but for" connection could be a reasonable interpretation of the words used in the excluded-assets provision. *See, e.g.*, *Evanston Ins. Co. v. ATOFINA Petrochems., Inc.*, 256 S.W.3d 660, 666 (Tex. 2008) (defining "with respect to")*; In re Dillard Dep't Stores, Inc.*, 186 S.W.3d 514, 516 (Tex. 2006) (considering the meaning of "arising from"); *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004) (defining "arise out of")*. But see Lancer Ins.*, 345 S.W.3d at 58 (perceiving no causal distinction between "arising out of" and "resulting from" and finding no insurance coverage where covered property was not a substantial factor in causing the injury). In those settings, however, there are policy considerations not implicated here that generally tip the scales towards a liberal construction. *See, e.g.*, *Dillard Dep't Store*, 186 S.W.3d at 516 (resolving any ambiguity as to scope of "arising from" in favor of arbitration); *Utica Nat'l Ins.*, 141 S.W.3d at 202 (because insurance policy involved an exclusionary clause, court was required to adopt the construction urged by the insured if not unreasonable).

Granting that the relevant terms could reasonably incorporate a "but for" standard, we cannot view the words divorced from their surroundings. When viewed in context, the broad causal standard Torch endorses would produce a result that is illogical, unreasonable, and inconsistent with the parties' expressed intent.

The fallacy of the featherweight nexus Torch claims is immediately apparent when section 1.2(g) is considered. That provision broadly excludes "all proceeds, income or revenues . . . attributable to . . . the Properties for any period prior to the Effective Date." The term "Properties" includes the nonproducing Ogle leases and other producing properties. Under Torch's construction, every pre-conveyance event would, in some way, be attributable to post-conveyance proceeds, income, or revenue. Construing the provision as Torch suggests leads to the unreasonable result that Torch would have conveyed the properties but none of the future value. In like manner, a "but for" standard would render the temporal division employed in the relevant exclusions utterly meaningless. Literally everything in existence or previously occurring at the time of transfer—including the transferred assets themselves—would be a but for cause of all that follows. To give effect to the words the parties chose, there must be more than a simple causal connection.

Thus, while the phrases "arising from," "with respect to," and "attributable to" may seem expansive out of context, the temporal limitations to which they are tied and other contextual clues necessarily narrow their scope and require no less than a substantial-factor relationship. We conclude there is no such relationship between the initial bonuses paid to secure the Ogle leases and the *Amber* judgment. The *Amber* judgment arises from the bonus payments only in the theoretical sense that there would be no leases to enforce without them. The judgment is likewise attributable to the leases and the lease-bonus payments only in the same metaphysical sense. The fact that the lease bonuses were used as the measure of damages for the *Amber* judgment does not elevate their significance in the causal analysis.

22

The 1990 CZMA amendment is more closely connected to the *Amber* judgment but it nevertheless lacks the requisite degree of connectedness. Although altering the regulatory landscape in ways that were not appreciated or understood for more than a decade after the amendment's enactment, the Federal Circuit court held that mere enactment of the amendment did not breach or repudiate the leases. *Amber II*, 538 F.3d 1369-70. In reality, the law did not, in and of itself, preclude development of the leases. Like many other laws, it imposed obligations and created a statutory cause of action, which may never have had any impact on the Ogle leases.

Following the 1990 amendment, the CZMA required federal agencies to submit a consistency determination to the relevant state agency and authorized the latter to file suit to challenge the determination and potentially block approval of offshore activities if the matter could not be settled otherwise. *See* 16 U.S.C. § 1456(c). None of the events precipitating the *Amber* litigation occurred until well after the 1996 PSA's effective date, save for the enactment of a law that furnished a basis for that to happen. Although the 1990 CZMA amendment was "the actual ground for revoking the granted suspensions and imposing directed suspensions in their place," *Amber II*, 538 F.3d at 1372, it was a factor giving rise to the restitution judgment only in the sense that it provided the legal authority that was the "but for" link in the causal chain culminating in the *Amber* judgment. Viewing the contract as reserving, in perpetuity, any claim, cause of action, or resulting judgment that could ever be asserted under laws in existence at the time of the conveyance is not a reasonable construction of the excluded-assets provision.

Because the proceeds of the *Amber* judgment are neither attributable to nor arising from or with respect to pre-conveyance events, they are not excluded assets within the meaning of sections

23

1.2(b)(i), 1.2(b)(ii), and 1.2(g) of the 1996 PSA. Torch therefore has no claim to any portion of the judgment.

### III. Conclusion

Having determined that Torch has no contractual right to the proceeds of the *Amber* judgment as a matter of law, we reverse the court of appeals' judgment and render judgment that Torch take nothing on its claims.

_____
Eva M. Guzman
Justice

**OPINION DELIVERED**: June 12, 2015