# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 28, 2024

Lyle W. Cayce
Clerk

―――――――――

No. 23-20414

―――――――――

20100 Eastex, L.L.C.,

*Plaintiff—Appellant*,

*versus*

Saltgrass, Incorporated,

*Defendant—Appellee*.

―――――――――――――――――――――――――――

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-1347

―――――――――――――――――――――――――――

Before Clement, Engelhardt, and Wilson, *Circuit Judges*.

Per Curiam:[*]

In 2017, 20100 Eastex, LLC (Eastex) purchased a piece of Texas property containing a defunct restaurant. Eastex then signed a lease agreement with BJ's Restaurants, Inc. (BJ's), with the understanding that BJ's would demolish the dormant restaurant and construct a new one in its place. The owner of the neighboring parcel, Saltgrass, Inc. (Saltgrass), had an easement over Eastex's parcel setting certain restrictions. Invoking those

―――――――――――――――――

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

restrictions, Saltgrass refused to give consent to BJ's for its demolition and construction plans. In response, Eastex filed suit against Saltgrass, seeking a declaratory judgment that it was entitled to demolish the existing structure and construct a new one. Eastex also sued for breach of contract. The district court properly dismissed the breach-of-contract claims but improperly dismissed the declaratory-judgment action on the grounds that part of the easement agreement was unambiguous. When read in context, the relevant portion of the agreement is ambiguous. Accordingly, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings.

## I.

## A.

Alongside the Eastex Freeway in Humble, Texas, a single tract of land used to offer the real-estate equivalent of a surf and turf: From a single parking lot, hungry travelers could access both a Joe's Crab Shack and a Saltgrass Steak House. In 2006, the tract was subdivided into two parcels: one containing the Joe's Crab Shack owned by Joe's Crab Shack Real Estate Holdings, Inc., and the other containing the Saltgrass Steak House owned by Saltgrass. The parcels' owners entered into a Reciprocal Easement Agreement and Restrictive Covenants (the Agreement).

Article II of the Agreement established various "Easements and Restrictions" on the parcels. Specifically, each owner granted the other an easement over the roads, sidewalks, and parking lots on its parcel and agreed to only use its parcel for a full-service, sit-down restaurant.

Article III of the Agreement contained additional terms designed to ensure the "Maintenance and Upkeep of [the] Easements," including a requirement in Section 3.3 that:

> No Owner may alter or reconfigure the [roads, sidewalks, and parking lots] located on such Owner's Parcel without the

express prior written consent of the other Owner, which may be withheld in such other Owner's good faith business judgment. Moreover, no Owner may relocate any buildings or other improvements located on such Owner's Parcel, nor construct any new building or other improvements on such Owner's Parcel, nor alter or reconfigure the "footprint" of the buildings and other improvements located on such Owner's Parcel without the express prior written consent of the other Owner, which may be withheld in such other Owner's good faith business judgment.

Under Section 7.10 of the Agreement, approval to take an action otherwise prohibited by the restriction in Section 3.3 would "be deemed to be given if not denied in writing to the requesting Owner specifying the specific reasons for such denial within fifteen (15) days of the date of written request for such approval from the requesting Owner."

**B.**

More than a decade later, Eastex purchased the parcel that housed the Joe's Crab Shack. But only months later, the corporation that owned Joe's Crab Shack went underwater and declared bankruptcy.

Enter BJ's. BJ's and Eastex signed a lease agreement under which BJ's would demolish the vacant Joe's Crab Shack building and construct a new building in its place.

On September 24, 2019, BJ's (not Eastex) sent a written request to Saltgrass for approval of its planned construction project under Section 3.3 of the Agreement. Sixteen days later, on October 10th, Saltgrass rejected BJ's request via email without explanation. BJ's sent a second letter to Saltgrass on October 25th stating that because Saltgrass's email did not provide "a good faith business rationale" for its rejection of BJ's planned construction project, BJ's deemed the project approved by Saltgrass under Section 7.10 of

the Agreement. Saltgrass promptly responded via letter on November 1st, arguing that BJ's was incapable of requesting formal approval of its planned construction project under the Agreement because BJ's was not an "Owner" as defined by the Agreement and, in any event, Saltgrass should not be deemed to have approved BJ's request.

At this point, the parties could have pursued a variety of different options. Eastex could have sent Saltgrass its own request for approval of the project. It did not. Eastex and Saltgrass could have hashed out a commercially reasonable resolution to their dispute (perhaps, for example, Saltgrass could have allowed Eastex to build the new restaurant subject to certain agreed-upon restrictions ensuring unobstructed ingress and egress to the property for Saltgrass's patrons in exchange for a monetary payment from Eastex to compensate Saltgrass for any inconvenience caused by the construction). They did not. Instead, this (needless) litigation ensued.[1]

In May 2020, Eastex filed suit against Saltgrass seeking (1) a declaratory judgment that the Agreement permits BJ's to tear down the existing building and build a new restaurant in its place, and (2) damages caused by Saltgrass's alleged breach of the Agreement. The district court granted summary judgment to Saltgrass, holding that "the express language of the . . . Agreement require[d] Eastex to obtain Saltgrass's consent before tearing down the existing structure or building a new one" and there was no evidence that Eastex—as opposed to BJ's—"ever made a written request to Saltgrass for consent to proceed with demolition or construction." Eastex appeals.

---

[1] The record suggests that the parties were initially willing to mediate this dispute but that after eight months of being unable to agree on a mediator or a date for the mediation, Saltgrass lost interest in mediation. Eastex remained open to mediation but agreed to litigate in response to Saltgrass's position.

No. 23-20414

## II.

This court reviews the district court's grant of summary judgment de novo, applying the same standard as the district court. *DeMarco v. Bynum*, 50 F.4th 479, 481 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 1005 (2023) (mem.). Accordingly, we may only affirm "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "On cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*, 73 F.4th 322, 327 (5th Cir. 2023) (quoting *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010)).

## III.

Eastex raises two arguments on appeal. First, that BJ's and Eastex did not need Saltgrass's approval under the Agreement to move forward with the planned construction project. And second, that BJ's, as Eastex's lessee, was entitled to send notice letters to obtain any necessary approvals under the Agreement. We address each contention in turn.

## A.

The district court found—and Saltgrass contends on appeal—that Section 3.3 of the Agreement is unambiguous. Because "no Owner may . . . construct any new building . . . on such Owner's Parcel . . . without the express prior written consent of the other Owner," Eastex needed Saltgrass's consent to construct a new restaurant on the property, according to the district court. We are not convinced that Section 3.3's restriction is so broad.

Under Texas law, a contractual provision is ambiguous if it "is subject to two or more reasonable interpretations." *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). Courts are to interpret a given contractual provision "in the context of the instrument as a whole" and "in light of the circumstances surrounding its execution." *Id.* The Texas Supreme Court has described its interpretive approach as "'a utilitarian standpoint bearing in mind the particular business activity sought to be served,' and avoiding unreasonable constructions when possible and proper." *Id.* (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). Critically, "courts must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section of a contract." *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995).

To be sure, when read in isolation, the second sentence in Section 3.3 of the Agreement appears unambiguous: no new construction without consent. But when read, as it must be, in the context of the Agreement as a whole, "in light of the circumstances surrounding its execution," and "bearing in mind the particular business activity sought to be served" by the Agreement, *Plains Expl.*, 473 S.W.3d at 305 (internal quotations omitted) (quoting *Reilly*, 727 S.W.2d at 530), another reasonable interpretation of Section 3.3 becomes apparent.

The purpose of the Agreement was "to establish certain easements over" the two parcels of land and "to restrict the use of" the parcels. Those "Easements and Restrictions" are set forth in Article II of the Agreement. The easements granted each Owner and their "Permittees"—defined to include "tenants . . . and all customers, employees, agents, contractors and other business invitees of the Owners and/or such tenants"—"unobstructed pedestrian and vehicular ingress, egress and passage" on the access drives, roadways, walkways, and parking areas on the parcels. The lone restriction

on use was that each Owner could only use their parcel to operate a "Full Service Sit-Down Restaurant," as defined therein.

Article III is entitled "Maintenance and Upkeep of Easements." This header is critical to our analysis. As the Texas Supreme Court has explained, "headings and titles provide context and can inform the meaning of the sections they label," and therefore "courts should construe contractual provisions in a manner that is consistent with the labels the parties have given them." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 121 (Tex. 2015). The header of Article III suggests that its provisions—including Section 3.3—were only intended to safeguard the *easements* granted in Article II. So, to the extent Section 3.3 created new restrictions on the use of the parcels, those restrictions only go as far as necessary to protect the easements and no farther. This reading properly recognizes Section 3.3's place "in the context of the instrument as a whole," "in light of the circumstances surrounding its execution," and acknowledging the business activity served by the Agreement. *Plains Expl.*, 473 S.W.3d at 305. Overlooking these interpretive principles in favor of isolating Section 3.3 is where the district court's analysis went awry.

As Eastex points out, aside from the provision restricting the use of the parcels to full-service, sit-down restaurants, the Agreement is primarily concerned with safeguarding unimpeded *access* to each of the parcels. Read with this purpose in mind, the second sentence of Section 3.3 is best understood as requiring approval to construct a new building *only if* the new building would impair access to or otherwise alter the parking spaces, access roads, or walkways on the property—i.e., impact the easements. Thus, there are at least two reasonable interpretations of Section 3.3: (1) as a requirement of approval for any new construction, and (2) as a requirement of approval for constructions affecting the easements. That "courts nationwide have long afforded restrictive covenants a narrow interpretation" further supports

the reasonableness of this second reading of Section 3.3. *Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 281 (Tex. 2018). In light of these two reasonable interpretations, Section 3.3 is ambiguous, and the district court erred in holding otherwise. *See Plains Expl.*, 473 S.W.3d at 305; *see also Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983) ("Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when [it] was entered.").

"When the agreement as written is ambiguous, . . . the parties' intent becomes a fact issue." *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 449 (Tex. 2015). The district court held that "as a legal matter, Eastex has no chance of prevailing on its declaratory judgment cause of action," meaning "Saltgrass [was] entitled to summary judgment on this claim." Because Section 3.3 is ambiguous, Eastex may prevail on its declaratory-judgment action.[2] We therefore reverse the grant of summary judgment on this claim and remand for further proceedings consistent with this opinion.

**B.**

Eastex's second argument on appeal is that as its lessee, BJ's had the power under the Agreement to send notice letters to obtain any necessary approvals from Saltgrass. This argument runs counter to Section 7.10 of the Agreement:

> Any approval permitted or required under this Agreement . . .
> shall be deemed to be given if not denied in writing to the

---

[2] Under Texas law, "[a]ny ambiguities in the language or parties' intent are construed against the drafting party, and [courts] adopt the interpretation that is the least burdensome to the non-drafting party." *McKenna v. Caldwell*, 387 S.W.3d 830, 834 (Tex. App.—Eastland 2012, no pet.). While there may be some dispute as to who drafted the Agreement, Eastex is undisputably a non-drafting party.

requesting Owner specifying the specific reasons for such denial within fifteen (15) days of the date of written request for such approval *from the requesting Owner*.

The provision clearly contemplates that the notice requesting approval would come from an Owner, defined under the Agreement as "[a] record owner . . . of fee simple title to all or any portion" of either parcel. BJ's is not an Owner under the Agreement. Unlike with respect to Section 3.3, there is no ambiguity as to Section 7.10 arising out of its context within the Agreement as a whole, the circumstances of its execution, or the business activity served by the Agreement.

Eastex fails to identify any provision of the Agreement either authorizing BJ's to send notice letters on behalf of Eastex or prohibiting Saltgrass from withholding approval from BJ's. Instead, Eastex argues that the right to send notice to Saltgrass passed from Eastex to BJ's by virtue of the lease agreement between them. But this argument confuses the property right of exclusive possession that BJ's acquired under the lease with the terms of the Agreement. Eastex presents no case in which a court held that a lease agreement modified or altered the terms of a separate contract.

Eastex brought two breach-of-contract claims against Saltgrass: one based on Saltgrass's allegedly unreasonable withholding of consent, and another based on Saltgrass's failure to timely and properly respond to BJ's notice letters. The district court dismissed both claims, reasoning that Eastex never asked Saltgrass for consent and that Saltgrass was not contractually obligated to respond to BJ's letters. Eastex fails to successfully challenge this holding on appeal. Accordingly, we affirm the district court's grant of summary judgment dismissing Eastex's breach-of-contract claims.

No. 23-20414

## IV.

In sum, the district court was wrong to grant summary judgment for Saltgrass as to Eastex's declaratory-judgment claim, but not as to Eastex's claims for breach of contract. Thus, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.