**NOT FOR PUBLICATION**

**FILED**

UNITED STATES COURT OF APPEALS

JAN 12 2026

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

HALL CA-NV, LLC,

　　　　　Plaintiff-Appellee /
　　　　　Cross-Appellant,

　v.

LADERA DEVELOPMENT LLC,

　　　　　Defendant-Appellant /
　　　　　Cross-Appellee.

Nos. 24-985, 24-1387

D.C. No.
3:18-cv-00124-RCJ-CSD

MEMORANDUM[*]

Appeals from the United States District Court
for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued and Submitted September 18, 2025
San Francisco, California

Before: HAMILTON, R. NELSON, and BUMATAY, Circuit Judges.[**]
Partial Dissent by Judge BUMATAY.

After a Reno hotel renovation project went into bankruptcy, senior lender

Plaintiff Hall CA-NV, LLC sued junior lender Defendant Ladera Development,

---

[*]　　This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**]　　The Honorable David F. Hamilton, United States Circuit Judge for the Court of Appeals, 7th Circuit, sitting by designation.

LLC for breach of contract and declaratory relief. The parties cross-appeal the district court's grant of summary judgment granting a split in title insurance proceeds and dismissing Ladera's counterclaims, and the court's award of damages after ordering a trial *sua sponte*. We reverse and remand.

1. The district court erred in granting summary judgment for Hall on the theory that the parties' agreement gave Hall a right to half of Ladera's title insurance. A Texas court's "primary objective is to ascertain and give effect to the parties' intent." *Bd. of Regents of Univ. of Tex. Sys. v. IDEXX Lab'ys, Inc.*, 691 S.W.3d 438, 442 (Tex. 2024) (citation omitted). Commercial contracts are construed "from a utilitarian standpoint" keeping in mind "the particular business activity." *Frost Nat'l Bank v. L & F Distrib.'s, Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (citation omitted).

No express provision in the Intercreditor Agreement gives Hall the right to Ladera's title insurance payouts. Ladera was not required to obtain title insurance, let alone to make Hall a co-insured on the policy. This silence counsels against the inference that these sophisticated parties intended the improbable result sought by Hall, which appears to have no known precedent in similar financing disputes.

The general terms of Section 3(a) of the Agreement are not to the contrary. Section 3(a) addresses "insurance proceeds and condemnation awards," which relates to destruction or eminent domain. This clause is modified by the following

clause: "to be applied to the restoration of the Property." Title insurance insures something else—risk in the legal priority of liens and ownership rights. The Agreement's references to insurance are best understood as applying to insurance the parties agreed to purchase as part of this deal, which did not include Ladera's purchase of title insurance on its own to protect itself.

Hall's Section 1(b) argument also fails. Per the Agreement, "Junior Debt" includes the Junior Loan, "all additional loans or advances under or in connection with the Junior Loan Documents," and "all accrued interest, fees, costs and other amounts incurred under or in connection with the Junior Loan Documents." Ladera's title insurance is not a Junior Loan Document. Nor is it an "additional loan[] or advance" or some sort of "interest, fees, costs and other amounts incurred under" those documents.

The district court also invoked language in Section 1(b) to conclude that Ladera's title insurance proceeds would be payments "otherwise to or for the benefit of the holder or holders of Junior Debt." But any number of unrelated payments could be characterized as "to or for the benefit of the holder . . . of Junior Debt," including tax refunds or insurance proceeds for Ladera for other projects. We see no persuasive reason to stretch the Agreement to reach such unrelated payments. *See Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 219 (Tex. 2022). While we understand the district court's Solomonic effort to split the

difference here, Hall has no right to any proceeds of Ladera's title insurance policy.[1]

2. We reverse the district court's grant of summary judgment for Hall on Ladera's fraudulent inducement and negligent misrepresentation counterclaims. Both theories share as an element the party's justifiable reliance on a false statement made by the other party. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653–54 (Tex. 2018). "Justifiable reliance usually presents a question of fact." *Id.* at 654. "In an arm's-length transaction," the party alleging fraud "cannot blindly rely on a representation by a defendant where the plaintiff's knowledge, experience, and background warrant investigation." *Id.* (citation omitted). Reliance is not justified when a party fails to heed "red flags." *Id.* at 655 (citation omitted).

---

[1] The dissent's contrary reading is based on an overly literal approach to interpretation often rejected by Texas courts. As a general matter, Texas courts do not read contractual provisions in isolation, devoid of their context. *E.g.*, *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 766–67 (Tex. 2018). They are especially wary of doing so in the commercial context. Texas courts avoid constructions of commercial contracts that would lead to perverse, unreasonable, inequitable, or oppressive results, as would be the case here. *E.g.*, *Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 809–11 (Tex. 2023) (rejecting interpretation of force majeure clause that would have allowed its application based on scheduling error); *Frost Nat'l Bank*, 165 S.W.3d at 313 (rejecting construction of equipment lease that would have allowed lessee to purchase equipment at discounted rate any time before end of lease term).

A reasonable jury could find that Ladera justifiably relied on Hall's representations. *See Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1035–36 (9th Cir. 2005). First, a jury could reasonably find that the spreadsheet was not a red flag. The entries are ambiguous and may have lacked obvious significance. For example, the line entries under "Construction" might have referred to construction work that had already been paid off at the time. Second, a 49-page memorandum in March 2014 noted that the hotel was closed during the fall of 2013 for "roof repairs, model room, and abatement work in preparation for the full construction start." That one-sentence description did not indicate the work was not paid off. Third, the construction fencing surrounding the property was not necessarily a red flag. Ladera offered evidence that could allow a reasonable jury to conclude that the fencing might have been there for other reasons, such as security. Deciding whether these interpretations of the facts are reasonable is up to a jury. Fed. R. Civ. P. 56(c); *Dominguez-Curry*, 424 F.3d at 1035–36.

3. We affirm summary judgment on the counterclaims for rescission based on unilateral and mutual mistake. We are not persuaded that Ladera's counterclaims were time-barred. Ladera had to wait until the underlying bankruptcy proceeding ended before it could seek to rescind the Intercreditor

Agreement.  *See Reagan & Co. v. Tabor*, 540 S.W.2d 575, 576 (Tex. App.—Waco 1976, writ ref'd n.r.e.).

But on the merits, the district court correctly rejected Ladera's mistake theories.  Both claims for equitable relief require proof that the mistake "materially affects the agreed-on exchange." *Wyrick v. Bus. Bank of Tex., N.A.*, 577 S.W.3d 336, 350 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *see also James T. Taylor & Son, Inc. v. Arlington Indep. Sch. Dist.*, 335 S.W.2d 371, 372–73 (Tex. 1960) (listing elements of unilateral mistake).  Ladera does not point to any facts in the summary judgment record suggesting that the mistake was so material at the time of contracting that it affected the agreed-on exchange.  We find no reason for reversal on the mistake counterclaims.

The judgment of the district court is **REVERSED** and the case is **REMANDED** to the district court for further proceedings consistent with this memorandum.

*Hall CA-NV v. Ladera*, Nos. 24-985, 24-1387
BUMATAY, Circuit Judge, dissenting in part:

I would have held that Hall CA-NV, LLC (Hall) was entitled to Ladera Development LLC (Ladera)'s title insurance proceeds under sections 1(b) and 3(a) of the Intercreditor Agreement. So I respectfully dissent in part. But I agree with the majority that reversal and remand for further proceedings is appropriate because the district court improperly granted summary judgment to Hall on Ladera's counterclaims for fraudulent inducement and negligent misrepresentation.

1. Under Texas law, a court's "primary objective" when interpreting contracts "is to ascertain and give effect to the parties' intent *as expressed in the instrument*." *U.S. Polyco, Inc. v. Texas Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 387 (Tex. 2023), *reh'g denied* (Jan. 26, 2024) (emphasis added). "[I]t is the objective, not subjective, intent that controls." *Id.* (simplified). And each provision of the contract "must be considered in the context of the instrument as a whole." *Plains Expl. & Prod. Co. v. Torch Energy Advisors*, 473 S.W.3d 296, 305 (Tex. 2015). "[T]he most important consideration in interpreting any contract [is] 'the plain meaning of the [agreement's] operative language.'" *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 149 (Tex. 2020) (simplified). And "[w]ithout some indication to the contrary, general words . . . are to be accorded their full and fair scope [and] are not to be arbitrarily limited." *Id.* at 152 (simplified). So the plain

text—and the general thrust of the contract as the plain text reflects it—is what controls.

Taken together, the intercreditor agreement entitles Hall to Ladera's title insurance proceeds. This conclusion follows from multiple provisions of the agreement.

Start with Section 1(b). Under Section 1(b) of the Intercreditor Agreement, Hall was entitled to priority in "any payment of any character . . . on account of the Junior Debt or otherwise to or for the benefit of the holder or holders of Junior Debt" as the holder of the Senior Debt. This language is broad. It sweeps in *any* payment, of *any* character, either *on account of* the Junior Debt or *for the benefit of* its holder.

Proceeds from Ladera's title insurance were payment on account of the "Junior Debt." "A title insurance policy is a contract of indemnity." *Chicago Title Ins. v. McDaniel*, 875 S.W. 2d 310, 311 (Tex. 1994). It "indemnif[ies] the insured against losses caused by defects in title." *Id.*; *see also* Tex. Ins. Code § 2701.001. So here: It's uncontested that Ladera purchased its title insurance policy to insure the security of its loan to Cal-Neva. Ladera thus did so because of, for the sake of, or "on account of" the junior debt. *On Account Of, Oxford English Dictionary* (online edition) (defining "on account of" as "for the sake of," "in consideration of"; "by reason of," "because of");[1] *see also Rousey v. Jacoway*, 544 U.S. 320, 326 (2005)

---

[1] https://www.oed.com/dictionary/account_n?tab=meaning_and_use#36655871.

(similar). That Ladera purchased the title insurance to protect its loan to Cal-Neva makes the title insurance proceeds payments "on account of the Junior Debt."

That the title insurance proceeds aren't junior loan documents or the junior loan itself doesn't disturb this conclusion. Neither does the fact that Ladera's title insurance protected against losses caused by defects in title rather than discharging underlying debts on the property. Nor does it move the needle that such an interpretation would have the result of rewarding Hall for choosing not to pay for a title insurance policy that covered superior mechanic's liens from Penta's prior work while Ladera did.

The title insurance proceeds also fit the provision of payments "otherwise to or for the benefit of the holder or holders of Junior Debt." Ladera's title insurance policy was purchased to protect it in the event of title defect; its proceeds were unambiguously to its benefit. The concern that this provision could be read broadly and lead to absurd results doesn't allow us to ignore the contract's plain text. While we "avoid constructions of contract language that would lead to absurd results," that's only a consideration when the text's "ordinary, generally accepted meaning" isn't "plain." *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 219 (Tex. 2022). And we are not asked to consider a benefit wholly divorced from the loans here. Ladera purchased title insurance in connection with *this* loan, not some other project or part of its business. So there's nothing absurd about applying the provision

to the insurance benefits. Doing so would not reach an oppressive or perverse result—it would simply reach the result the text of the agreement demands.

And Section 1(b) is not the only provision that supports Hall's view; Section 3(a) does too. Section 3(a) of the Intercreditor Agreement provides that Ladera "shall release insurance proceeds and condemnation awards, to be applied to the restoration of the Property or to payment of the indebtedness evidenced and secured by the Senior Documents." Rather than limiting the scope of what insurance proceeds are implicated, this language explains how the insurance proceeds are to be used: for protecting the property's physical condition *or* applied to payment of the debt secured by the Senior Documents. And nothing in this provision expressly limits the scope of insurance proceeds available. So it is at least amenable to being read to include title insurance proceeds. And in connection with Section 1(b), that amenability becomes near-certainty.

Finally, while it doesn't directly support Hall's claim, Section 1(a) relevantly sets the overall tone of the agreement. It provides that Ladera generally "intentionally waive[d], relinquishe[d], and subordinate[d] priority and superiority of the Junior Loan Documents and the rights, privileges and powers of the Junior Lender thereunder[.]" So as the district court observed, while this clause doesn't directly govern whether Hall is entitled to the proceeds of Ladera's title insurance, it *does* suggest that the overall nature of the contract is to subordinate Ladera's

interests—especially its *insurance policies*, in connection with its loan to Cal-Neva—to Hall's.

Thus, considering the plain meaning of each provision and construing the contract as a whole, I would conclude that Hall is entitled to as much of Ladera's title insurance proceeds as necessary to pay off the remainder of its loan.

2. I agree with the majority that the district court erred in granting summary judgment to Hall on Ladera's counterclaims for fraudulent inducement and negligent misrepresentation. So I would still reverse the district court's decision and remand the case for further proceedings.

I respectfully dissent in part.