**Affirmed and Memorandum Opinion filed August 16, 2016.**



In The

# Fourteenth Court of Appeals

## NO. 14-15-00463-CV

**CROSSLAND ACQUISITION, INC., Appellant**

**V.**

**HNTB CORPORATION, Appellee**

**On Appeal from the 190th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2013-63341**

# M E M O R A N D U M   O P I N I O N

Crossland Acquisition, Inc. appeals the trial court's grant of summary judgment in favor of HNTB Corporation. In a single issue, Crossland contends the trial court erred in determining that the parties' contracts required Crossland to complete all services for a fixed maximum price. We affirm.

BACKGROUND

The Texas Department of Transportation ("TxDOT") hired HNTB in June 2006 to serve as the program manager in charge of planning and design management for the U.S. 290/Hempstead corridor expansion program. HNTB, in turn, hired numerous subcontractors to perform a broad range of services including financial planning, right-of-way surveying and acquisition, utility coordination, geotechnical services, design support, and construction oversight.

Crossland was one of the subcontractors HNTB hired to perform right-of-way acquisition services for certain parcels of land along the highway expansion project. To that end, HNTB and Crossland signed a Master Agreement in July 2006. The Master Agreement provided the general terms governing the relationship between HNTB and Crossland but did not identify any specific services that Crossland would perform under the contract; instead, the Master Agreement provided that HNTB and Crossland would use Task Orders to describe their "mutual agreement on the scope of the Services, schedule, compensation and other particulars . . . ."

HNTB and Crossland executed several Task Orders; relevant to this case are Task Orders 3 and 4. These Task Orders identified right-of-way acquisition services Crossland was to perform concerning two groupings of land tracts collectively referred to as Proposition 12 and Proposition 14. Task Order 3 provided that, "[i]n return for the performance of the foregoing obligations, HNTB shall pay to [Crossland] the maximum amount of $1,988,636.46 . . . ." Task Order 4 similarly provided that HNTB would pay Crossland the "maximum amount" of $1,079,550.74 in return for Crossland's performance of its obligations under that Task Order.

Task Orders 3 and 4 further provided that the "maximum amount" owed under each Task Order was payable pursuant to a fee schedule attached to each Task Order. The fee schedules for both Task Orders identified the "method of payment" as "specified rate," meaning that HNTB would pay Crossland for the work Crossland performed during the previous billing cycle based on specified hourly rates.

The parties subsequently executed four supplemental agreements pertaining to Task Order 3 and two supplemental agreements pertaining to Task Order 4. The supplemental agreements enlarged the scope of work Crossland was to perform, extended the termination dates of the Task Orders, and increased the maximum amounts payable under the Task Orders.[1]

Work proceeded on the U.S. 290/Hempstead corridor expansion program for several years. In early 2012, Crossland notified HNTB that it would "reach its maximum sum payable on Task Order 3" during that billing cycle. Crossland asserted that because the contract was "a cost-reimbursement contract with a maximum sum and negotiated rates, not a fixed[-]price agreement," it had "no authorization to perform work which will exceed this maximum sum." Accordingly, Crossland stated that it would cease all work under Task Order 3 once the maximum amount payable was reached. HNTB responded as follows:

---

[1] To account for the additional scope of services added under Task Order 3, the parties executed supplemental agreements that extended the termination date from September 30, 2011, to January 31, 2013, and increased the maximum amount payable to $2,700,775.69.

Task Order 4 was amended by supplemental agreements to extend the termination date from June 30, 2012, to November 30, 2013, and to increase the maximum amount payable to $1,282,100.74. One supplemental agreement to Task Order 4 changed the method of payment for work performed under that specific supplemental agreement to "unit costs," meaning that HNTB paid Crossland specified amounts when Crossland hit certain "milestones" — completion of specified tasks.

We are in receipt of your letter . . . noting that Crossland will reach its maximum amount under this Task Order during this current period. Please note that the maximum amount is also subject to the contracted scope of services. . . . Note that management of the available funds to complete the contracted scope of services is the responsibility of Crossland related to services contracted in a specific work authorization. Should appropriate actions not be taken or unsatisfactorily taken [sic] to manage the work tasks within the budget, this does not necessarily relieve the provider of the responsibility for the contracted scope of services.

While Crossland has indicated that they may be approaching the maximum amount, we have not received adequate detail on proposed additional scope or justification clarifying that additional scope of work is warranted. Note that we have had numerous conversations and provided email correspondence on our concern that the funds needed to be adequately managed based on contracted scope of services. . . .

. . . In accordance with the contract, you should not perform any additional scope of services unless specifically included in a supplemental work authorization approved by TxDOT. However, this does not relieve you from the responsibility of performance of the current contracted scope.

Crossland continued to perform work under the Task Orders, but was not paid for any work beyond the maximum amounts stipulated in the Task Orders and the supplemental agreements.[2]

Crossland sued HNTB in October 2013 asserting breach of contract and quantum meruit claims. Crossland contended that its contracts with HNTB only required it to perform work on an hourly basis until it reached the maximum amount payable; upon reaching that amount, Crossland contended, it could perform no further work absent agreement with HNTB to increase the maximum amount payable regardless of the completion status of any pending tasks.

---

[2] Crossland contends it is owed an additional $967,785.07 for uncompensated work it performed beyond the maximum amounts payable under Task Orders 3 and 4.

4

Accordingly, Crossland contended that HNTB breached the contract by requiring Crossland to perform work without compensation. Alternatively, Crossland argued that it was entitled to recover value of the work that it performed for HNTB in excess of the contractual maximum amounts under a theory of quantum meruit.

Crossland and HNTB filed cross-motions for summary judgment in December 2014. The trial court denied Crossland's motion and granted HNTB's motion in January 2015. Crossland subsequently contended that the parties had moved for summary judgment only on Crossland's breach of contract claim. The trial court issued an amended order in February 2015 clarifying that its January summary judgment order was interlocutory. HNTB then moved for summary judgment on Crossland's quantum meruit claim, which the trial court granted in May 2015. The second summary judgment order resolved all claims in the case and resulted in a final judgment.[3] Crossland timely appealed.

## STANDARD OF REVIEW AND APPLICABLE LAW

We review summary judgments *de novo*. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). In a traditional motion for summary judgment, the movant must show there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). When both parties move for summary judgment and the trial court grants one motion and denies the other, we review both sides' summary judgment evidence and render the judgment the trial court should have rendered. *S. Crushed Concrete, LLC v. City of Houston*, 398 S.W.3d 676, 678 (Tex. 2013).

---

[3] HNTB moved for summary judgment on Crossland's quantum meruit claim on both traditional and no-evidence grounds. Our disposition based on HNTB's traditional motion makes it unnecessary for us to address whether summary judgment was proper on no-evidence grounds.

5

In this case, the trial court's summary judgment involved interpretation of the parties' contracts. "Absent ambiguity, contracts are construed as a matter of law." *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). In construing a contract, we attempt to ascertain the parties' true intentions as expressed in the language they chose, and we avoid unreasonable constructions when possible. *Id.* We consider the entire contract, giving effect to all provisions so that none are rendered meaningless. *Id.* "No single provision taken alone is given controlling effect; rather, each must be considered in the context of the instrument as a whole." *Id.* We give words their plain, common, or generally accepted meaning unless the contract shows that the parties used words in a technical or different sense. *Id.*

Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). A contract is not ambiguous if its language can be given a certain or definite meaning. *Plains Expl. & Prod. Co.*, 473 S.W.3d at 305.

If a contract is ambiguous — meaning it is subject to two or more reasonable interpretations — then summary judgment is not proper. *See id.* Extrinsic evidence of the parties' intent is not admissible to create an ambiguity, but the contract may be read in light of the circumstances surrounding its execution to determine whether an ambiguity exists. *Id.* "Mere disagreement over the interpretation of an agreement does not necessarily render the contract ambiguous." *Id.*

ANALYSIS

Crossland contends in a single issue that the trial court erred in determining — by granting HNTB's motions for summary judgment — that the parties' contracts required Crossland to complete all services for a fixed maximum price. Crossland contends that a plain reading of the contractual documents makes clear that Crossland was not required to complete all services under Task Orders 3 and 4 for all parcels for the "maximum amount."

HNTB contends that the contracts required Crossland to complete the stated services for all tracts of land under a capped hourly fee structure wherein Crossland would be paid on an hourly basis up to a specified dollar amount. In other words, HNTB contends it was entitled to Crossland's performance of the identified services for the maximum amounts — or less if Crossland finished the services expeditiously.

We begin by reviewing the contracts' relevant provisions.

## I.    Master Agreement

The Master Agreement sets out general terms governing the parties' multi-year agreement. The Master Agreement states that the specifics of the agreement — "the scope of the Services, schedule, compensation and other particulars" — will be described in Task Orders, which are "binding only after acceptance and execution by duly authorized representatives of both parties." Relevant provisions of the Master Agreement further state that:

- "[Crossland] shall provide the Services described in Section A (Scope of Services) of each Task Order;"

- "[Crossland] shall perform the Services pursuant to the time frame set forth in Section B (Schedule) of each Task Order" and that

7

"[Crossland]'s failure to so perform shall be considered a material breach" of the Master Agreement;

- "HNTB shall pay [Crossland] in accordance with Section C (Compensation) of each Task Order and in accordance with all applicable provisions of the Prime Agreement;"[4] and

- "There is no guarantee, either expressed or implied, as to the actual dollar amount that will be authorized under this Agreement through Task Orders. In no event shall Task Orders be issued that will exceed the maximum amount authorized by [TxDOT]."

## II.    Task Orders

The two Task Orders relevant to this dispute are Task Orders 3 and 4. Both Task Orders state that Crossland "shall perform" the services identified in the attached exhibits; that Crossland "shall perform" those services "and deliver the related Documents (if any) according to" the schedules in the attached exhibits; and "[i]n return for the performance of the foregoing obligations, HNTB shall pay to [Crossland] the maximum amount[s] of" $1,988,636.46 (Task Order 3) and $1,079,550.74 (Task Order 4) "in accordance with Attachment E and E-1 of the Master Agreement and the attached Exhibit D – Fee Schedule."[5,6]

---

[4] The Prime Agreement — the contract between HNTB and TxDOT — contains a provision requiring HNTB to pay any subproviders (such as Crossland) within 10 days after receiving payment from TxDOT. The Prime Agreement does not contain any other clauses relevant to this dispute. Moreover, the Master Agreement provides that all portions of the Prime Agreement "pertinent to [Crossland]'s responsibilities, compensation, and timing of Services and not in conflict with any provision of [the Master Agreement] are incorporated herein and made binding on [Crossland]." The Master Agreement does not make any of the Prime Agreement's terms binding on HNTB in the context of the HNTB/Crossland relationship. The Master Agreement further provides that, in the event of a conflict between the terms of the Master Agreement and the Prime Agreement, the Master Agreement controls.

[5] As previously discussed, the "maximum amount[s]" payable were increased by

8

## A.    Task Order 3[7]

Task Order 3 states that it "includes [right-of-way] acquisition management services for the Proposition 12 portion of the IH 610/US 290 interchange and select advance acquisitions along US 290 such as for detention pond parcels."

Under Task Order 3, Crossland "shall be responsible for management of all services and preparation of all documentation for all Final [right-of-way] acquisition, easement acquisition, permitting and related relocation assistance . . . ." Task Order 3 sets out a number of services Crossland is obligated to perform, including right-of-way acquisition management; title services; initial appraisal services; initial appraisal review services; appraisal update services; appraisal review update services; right-of-way negotiations; closing services; relocation assistance services; condemnation support (including pre-hearing and post-hearing support); clearance/demolition of final right-of-way services; and deliverables

---

supplemental agreements to $2,700,775.69 (Task Order 3) and $1,282,100.74 (Task Order 4).

[6] The Master Agreement does not appear to contain an Attachment E, but does contain the Prime Agreement as an exhibit, and the Prime Agreement contains an Attachment E consisting of fee and rate schedules. The Prime Agreement's Attachment E identifies the "basis of payment for this contract" as both "Specified Rate Basis" and "Cost Plus Fixed Fee." Attachment E states that under the "Specified Rate Basis" basis of payment "[p]ayment shall be based on the actual hours worked multiplied by the specified rate for each type of labor plus other agreed to special direct cost items," and that "[t]he specified rate is not subject to audit." Attachment E also includes a rate schedule applicable to Crossland that identifies the hourly rates for various classifications of Crossland employees.

HNTB and Crossland executed two supplemental agreements to the Master Agreement. Attachment E-1 to Supplemental Agreement 1 is a revised hourly rate schedule for Crossland employees. Attachment E-2 to Supplemental Agreement 2 — which was executed after Task Orders 3 and 4 were executed — consists of a revised rate schedule identifying maximum costs for certain types of services.

[7] The specific terms of the Task Orders concerning scope of services, schedule, and compensation are set out in exhibits attached to each Task Order. In the interest of convenience, we simply refer to the relevant Task Order when discussing any terms contained in a Task Order's pertinent exhibits.

9

(including, *e.g.*, monthly summaries of expenses, budget projections, and monthly status reports).

## B.    Task Order 4

Task Order 4 states that Crossland "will provide the overall project supervision, management, scheduling, administration for [right-of-way] acquisition services for the Proposition 14 portion of the IH 610/US 290 Interchange Outbound Connectors project." It further states that Crossland "shall complete all administrative activities and assemble all documentation sufficient for the State to acquire the Final [right-of-way] as applicable to the 34 parcels covered in this Task Order."

As in Task Order 3, Task Order 4 identifies a number of services Crossland is expected to complete. For example, in one section titled "PMC's Responsibility"[8] the Task Order states:

> During the initial period of this Task Order, [Crossland] shall be responsible for management of all services and preparation of all documentation for all Final [right-of-way] acquisition, easement acquisition and related relocation assistance for all parcels identified in Segment 3 [right-of-way] Maps east of W. 34th Street and north of US 290 as well as parcels in the Segment 2 [right-of-way] Maps east of IH 610 at Minimax and at Old Katy Road and associated parcels for detention as required to construct the Segment 3 outbound connectors project as approved by the Texas Transportation Commission in October 2010 for Proposition 14 funding related to [right-of-way] acquisition/Utility relocation and Construction . . . . The Work related to Final [right-of-way] acquisition includes, but is not limited to appraisal, appraisal review, negotiation, acquisition,

---

[8] Task Orders 3 and 4 refer throughout to "the Consultant" and "the PMC." "The Consultant" is defined as Crossland. Both Task Orders also state that "[t]he Consultant is a member of the US 290/Hempstead Corridor Program Management Consultant (PMC). For the initial period of this Task Order, the Consultant will participate and/or support all tasks noted herein as the responsibility of the Program Management Consultant (PMC) . . . ."

procurement of title insurance, clearing of title, closing of acquisitions, condemnation support, all exhibits and photos associated with condemnation services and proceedings required by the Attorney General's office, relocation assistance, clearance/demolition of improvements, and environmental testing and remediation, as required.

The Task Order then provides detailed descriptions of specific services required under each of the general categories of services identified in the paragraph above.

## III. Contract Interpretation

Neither party contends the contracts are ambiguous; rather, each party asserts that the contracts unambiguously require the outcome for which they advocate. *See Plains Expl. & Prod. Co.*, 473 S.W.3d at 305 (disagreement over the interpretation of an agreement does not necessarily render the contract ambiguous). However, contract ambiguity is a question of law for us to decide regardless of the parties' positions. *See Sage St. Assocs.v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993).

Crossland advances a number of arguments in support of its contention that the contracts did not require it to complete all services for all land parcels for a fixed price. Although Crossland does not clearly delineate its contentions, Crossland appears to contend that: (1) it was contractually obligated to provide only "deliverables;" (2) it was contractually obligated to perform only work before the contractual termination dates; (3) the contracts did not explicitly identify the tracts of land on which Crossland was required to perform right-of-way services; (4) it could not be required to perform all services for all tracts for the "maximum amount" because the contracts allowed HNTB and TxDOT to assign additional tracts of land under supplemental agreements at a later date; and (5) because the contracts specified that Crossland would be paid specified hourly rates that were

11

"not subject to audit," requiring Crossland to perform unpaid work beyond the "maximum amount" would violate the contracts. We address each argument in turn.

### A. Deliverables

Crossland contends that "[d]uring the time limitations of Task Orders 3 and 4, Crossland was contractually obligated to provide 'deliverables.'" Crossland argues that the deliverables it was required to provide consisted of monthly status reports, budget projections, and anticipated funding requirements, and that "[t]hese 'deliverables' were the 'foregoing obligations' Crossland had to perform in order to get paid under the contract."

Crossland cites to no contractual provision stating it is required to provide only "deliverables" under the contracts. To the contrary, the Master Agreement states that Crossland "shall provide the Services described in Section A (Scope of Services) of each Task Order." The Task Orders' "Section A. - Scope of Services" provisions state that Crossland "shall perform" services identified in exhibits to the Task Orders. As described in detail above, the relevant Task Order exhibits identify a laundry list of services that Crossland is to perform, one of which is to provide "deliverables."

Crossland's contention that its only obligation under the contracts was to provide "deliverables" is an impermissibly narrow reading of the express contract language. Crossland's contract required Crossland to perform services; the "deliverables" were documents reflecting the intangible services Crossland performed. We conclude that the contracts unambiguously required Crossland to perform the numerous right-of-way acquisition services identified in the Task Orders, one of which was to provide timely deliverables evidencing Crossland's progress on other contractually required services.

12

## B.     Termination Dates

The Task Orders contained work schedules with project completion dates. As additional work was assigned to Crossland that exceeded the scope of the Task Orders, the parties executed supplemental agreements that extended the termination dates. Crossland argues that "the contract's termination dates were the timeline during which Crossland was required to provide, but not complete, its budgeted level of effort services for the parcels." Essentially, Crossland appears to argue that it was required to stop work on the projects once the termination dates were reached absent an amendment to the Task Orders.

Crossland's interpretation ignores language in the Master Agreement stating that Crossland "shall perform the Services pursuant to the time frame set forth in Section B (Schedule) of each Task Order," and that Crossland's "failure to so perform shall be considered a material breach" of the Master Agreement. Contrary to Crossland's assertion, the contracts did not expire on the termination dates; rather, Crossland was required to complete all tasks for all tracts of land under each Task Order by the termination dates, and its failure to do so constituted a material breach of the contracts.

## C.     Identification of Parcels

Crossland argues that the Task Orders did not explicitly identify the tracts of land on which Crossland was required to perform right-of-way services. Crossland appears to be arguing that it could not be required to perform all services for all tracts if it did not know which tracts were encompassed by each Task Order.

Crossland's argument lacks merit. Task Order 3 states that it "includes [right-of-way] acquisition management services for the Proposition 12 portion of the IH 610/US 290 interchange and select advance acquisitions along US 290 such

13

as for detention pond parcels."  Task Order 4 states that Crossland "will provide the overall project supervision, management, scheduling, administration for [right-of-way] acquisition services for the Proposition 14 portion of the IH 610/US 290 Interchange Outbound Connectors project," and specifies that the Task Order covers 34 parcels.

Although the parcels comprising Proposition 12 were not specifically identified in Task Order 3, meeting notes from a June 15, 2010 right-of-way coordination meeting — more than a month before Crossland signed Task Order 3 — state that "[t]he Proposition 12 parcels are identified in the spreadsheet handout."  The meeting notes indicate that three Crossland representatives were present, including Crossland's president who signed Task Order 3.  The meeting handout consists of a spreadsheet identifying the "US 290-Houston Proposition 12 Parcels;" this spreadsheet provides Tax IDs, identifies owners of record, and includes other pertinent information for each parcel.  Similarly, an email dated two days before Crossland signed Task Order 3 shows that Crossland had access to the legal descriptions and plats for the Proposition 12 parcels.

Reading the contracts in light of the circumstances surrounding their execution, we conclude that no ambiguity exists as to the parcels covered by the Task Orders.  *See Plains Expl. & Prod. Co.*, 473 S.W.3d at 305; *see also Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 132 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd) ("We are free to examine prior negotiations and all other relevant incidents bearing on the intent of the parties . . . .").  Crossland agreed to perform services under Task Order 3 for tracts in Proposition 12 that were specifically known to Crossland, and under Task Order 4 for 34 tracts in Proposition 14.  We reject Crossland's argument that the contracts could not require Crossland to perform all services for all parcels for a set

14

maximum price due to uncertainty regarding what parcels were covered by the agreements.

### D.  Supplementation of Task Orders

As in its previous argument, Crossland also contends it could not be required to perform all services for all tracts for the "maximum amount" because the contracts allowed HNTB and TxDOT to assign additional tracts of land under supplemental agreements at a later date.  Crossland cites to language in the Task Orders that "[t]he State, at its option, may elect to expand, reduce or delete the extent of each work element . . . ."  Crossland also cites to language that:

> [t]here is no guarantee that any or all of the services described in this Task Order will be assigned by the State and/or HNTB during the term of this Task Order.  The State, at its option, may elect to have any of the services set forth herein performed by other consultants or TxDOT staff.  The Services on this Task Order are generally for major elements during Preliminary and Final Design Development and many of these services have started in the previous Task Orders . . . and/or will be completed or continued in subsequent Task Orders as deemed necessary by the State.

Crossland contends that the trial court's interpretation of the contract requires Crossland to complete services for an unknown number of tracts for a set maximum price.

Viewing all of the contracts' terms as a whole, we conclude that Crossland's interpretation is misguided.  While the Task Orders do provide that TxDOT may expand, reduce, or delete the extent of the work assigned, they only allow TxDOT to do so "provided such action does not alter the intent of" the Task Orders.  To that end, each time TxDOT or HNTB desired Crossland to perform services for additional parcels not previously included under the Task Orders, HNTB and Crossland executed supplemental agreements to the Task Orders that (1) identified

the new parcels and services required; and (2) increased the maximum amounts payable and extended the Task Orders' termination dates.

Additionally, the contracts' scope of services are not indefinite merely because there is no guarantee that any or all of the services described in the Task Orders will be assigned by the State or HNTB. As discussed below, the contractual notice that "[t]here is no guarantee that any or all of the services . . . will be assigned" explains why Crossland was paid on an hourly rate basis rather than in a lump sum. Crossland could earn up to the maximum amounts payable if it performed services for all identified tracts; but if TxDOT or HNTB chose not to assign certain tracts, then Crossland's diminished compensation would reflect that it performed services only for a smaller number of tracts. Just as the Task Orders contain maximum amounts payable, they also contain limits on the number of tracts Crossland is expected to service. In other words, the contracts unambiguously state that, while TxDOT or HNTB may assign less work to Crossland under the contracts, they may not assign more work without an agreement with Crossland concerning the terms surrounding that additional work.

We reject Crossland's contention that the contracts could require it to perform an unlimited amount of work for a set maximum price.

### E. Specified Rate

Crossland argues that in the contracts the parties stipulated Crossland would be paid specified hourly rates that were "not subject to audit;" according to Crossland, requiring it to perform unpaid work beyond the "maximum amount" would violate those provisions. Crossland argues the contracts could not have required it to perform all services for all tracts for a set maximum amount.

16

Crossland's argument conflates two distinct concepts: (1) the total amount of compensation to be paid under the Task Orders; and (2) the method by which that compensation is to be paid.

The Task Orders explicitly state that, "[i]n return for the performance of the foregoing obligations, HNTB shall pay to [Crossland]" specified maximum amounts identified in the Task Orders. Supplemental agreements to the Task Orders "increase[d] the maximum amount[s] payable" under the relevant Task Orders.

By contrast, other Task Order provisions specified the "method of payment" as "specified rate." The fee schedules attached to the Task Orders provided hourly rates applicable to different types of Crossland employees.

Harmonizing these provisions, we conclude the contracts explicitly and unambiguously state that the total amount of compensation Crossland was to receive in return for the performance of its services was capped at a fixed maximum amount. Under the "specified rate" method of payment, Crossland earned its fee on an hourly basis up to that maximum amount. The "specified rate is not subject to audit" language does not foreclose a cap on the overall contract price; it only forecloses renegotiation of the hourly rates.[9]

## IV.  Propriety of Summary Judgment

Having rejected all of Crossland's arguments in favor of its contractual interpretation, we determine as a matter of law that the unambiguous contract language required Crossland to perform all services for all tracts of land for compensation not to exceed the maximum amount stated in the Task Orders and their supplements. Accordingly, the trial court did not err by granting summary

---

[9] This conclusion is reinforced by statements in the rate schedules that "[a]ll rates are negotiated rates and are not subject to change or adjustment."

judgment in favor of HNTB on Crossland's breach of contract claim contending that HNTB failed to pay Crossland for work performed in excess of the contractual maximum amounts.

Likewise, because the services for which Crossland sought compensation were covered by the express contracts between the parties, summary judgment also was proper on Crossland's quantum meruit claim. *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) (orig. proceeding) ("A party generally cannot recover under *quantum meruit* when there is a valid contract covering the services or materials furnished.") (emphasis in original); *Hester v. Friedkin Cos.*, 132 S.W.3d 100, 106 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (same).

Accordingly, we overrule Crossland's sole issue.

## CONCLUSION

Having overruled Crossland's sole issue, we affirm the trial court's judgment.

/s/     William J. Boyce
        Justice


Panel consists of Chief Justice Frost and Justices Boyce and Wise.

18