

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00132-CV
No. 02-18-00135-CV

_____

APACHE CORPORATION, Appellant

V.

BRYAN C. WAGNER, WAGNER OIL COMPANY, TRADE EXPLORATION
CORPORATION, AND WAGNER & COCHRAN, INC., Appellees

---

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-296927-17

---

Before Sudderth, C.J.; Meier and Gabriel, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

## I. Introduction

In two issues in this interlocutory appeal,[1] Appellant Apache Corporation complains that the trial court erred (1) by denying its motion to compel arbitration because the parties' indemnity dispute falls within the scope of their arbitration agreement and (2) by deciding Appellees Bryan C. Wagner, Wagner Oil Company (WOC), Trade Exploration Corporation (Trade), and Wagner & Cochran, Inc. (W&C)'s motion to stay arbitration when a mandatory venue statute required that any arbitration challenge be decided by a court in Harris County. We reverse.

## II. Background

### A. The Parties

Apache is a Delaware corporation with its office located in Houston. WOC is a Texas corporation with its office located in Fort Worth, and Wagner is WOC's president and CEO. From January 1999 to June 2006, WOC acted as the operating entity for Wagner's oil and gas assets as well as for certain oil and gas assets owned by Trade and W&C that were purchased by WOC using funds provided by those entities.

---

[1]*See* Tex. Civ. Prac. & Rem. Code Ann. § 15.003(b) (West 2017), § 51.016 (West 2015).

## B.  The Agreements

### 1.  Purchase and Sale Agreement Between WOC and Apache

WOC purchased oil-and-gas-related assets[2] from Apache pursuant to a June 4, 2001 purchase and sale agreement (PSA) that was negotiated by WOC and executed by Wagner on WOC's behalf in his capacity as its president.  Wagner, Trade, and W&C provided the funds for the approximately $25 million purchase in, respectively, 80%, 19%, and 1% shares.[3]  The PSA listed the "Effective Time" of the purchase and sale as "April 1, 2001, at 7:00 a.m., at the location of the Assets."

With regard to Apache's representations and warranties in the PSA, the parties excluded compliance with "Environmental Laws," a defined term, and WOC acknowledged that its sole remedy for any noncompliance by Apache with "Environmental Laws" would be provided in Article 6 of the PSA.  Article 6 defined "Environmental Law" to mean "all laws, statutes, ordinances, rules and regulations of any governmental authority pertaining to protection of the environment in effect as of the Effective Time and as interpreted by court decisions or administrative orders as of the Effective Time in the jurisdiction in which such Asset is located."  And it

---

[2]These assets included oil and gas wells, leasehold estates created by oil and gas leases, fixtures and improvements appurtenant to these wells and leases, fee mineral interests, and "[a]ll oil, gas and other hydrocarbons produced from or attributable to" the leases, as well as various licenses, records, and other items related to the sale.

[3]WOC represented in the PSA that in buying the assets, it was not acting under any specific contractual commitment to any third party, or any specific nominee agreement with any third party, to transfer to, or to hold title on behalf of, such third party with respect to all or any part of the assets.

3

provided for (1) WOC, as the buyer, to give Apache, as the seller, written notice of adverse environmental conditions discovered on or before June 20, 2001, (2) waiver of those conditions for failure to give timely notice, and (3) the remedies available to WOC. To access these remedies, WOC had to give proper notice to Apache and then—before closing—the parties could (1) agree on an adjustment to the purchase price to reflect the cost to remedy the adverse environmental condition, (2) remediate the condition at Apache's cost, or (3) remove the damaged item from the assets being conveyed and reduce of the purchase price by the allocated value of that item.

Article 6.3 provided that Article 6 was the

> SOLE AND EXCLUSIVE REMEDY THAT [WOC] SHALL HAVE AGAINST [APACHE] WITH RESPECT TO ANY MATTER OR CIRCUMSTANCE OR LIABILITY RELATING TO ADVERSE ENVIRONMENTAL CONDITIONS, ENVIRONMENTAL LAWS, THE RELEASE OF MATERIALS INTO THE ENVIRONMENT OR PROTECTION OF THE ENVIRONMENT OR HEALTH.

Indemnity and arbitration were continuous themes in the PSA. With regard to inspection of the leases, for example, WOC agreed to indemnify and hold harmless Apache and its partners, joint interest owners, subsidiaries, affiliates, and their respective officers, directors, employees, and agents "from and against any and all losses or causes of action arising from [WOC's] inspection of the leases, including, without limitation, claims for (i) property damage, (ii) personal injuries or death of employees of [WOC], its contractors, agents, consultants and representatives, (iii) personal injuries or death of employees of [Apache], its contractors, agents, or

4

consultants or representatives, and (iv) personal injuries or death of third parties." And any title defect adjustment disputes required resolution "by Arbitration pursuant to Section 11.12."

Assignment was also addressed in the PSA in more than one place. With regard to the post-closing obligations as to the assets' files and records, WOC was obligated to retain and make available to Apache for seven calendar years after the closing date the files and records; any assignment by WOC of the purchased assets was made subject to this requirement. Article 11.5, "Assignment," provided that neither party could assign all or any portion of its rights or delegate all or any portion of its duties under the PSA "unless it continue[d] to remain liable for the performance of its obligations . . . and obtain[ed] the prior written consent of the other Party, which consent [could] not be unreasonably withheld." And Article 11.10, "Parties in Interest," provided that the PSA would be binding upon and inure both to WOC and Apache "and their respective successors and assigns."

Under Article 9.4, Apache retained some liabilities, and the PSA expressly covered what Apache would be responsible for as compared to WOC: Except for the retained liabilities, WOC expressly agreed to assume responsibility for and to pay, perform, fulfill, and discharge all claims, costs, expenses, liabilities, and obligations accruing or relating to the owning, developing, exploring, operating, and maintaining of the assets, "whether relating to periods before or after the effective time, including,

without limitation, all adverse environmental conditions, whether occurring before or after the effective time, regardless of the negligence or strict liability of [Apache]."

The parties also set forth their "express intention" that WOC was buying the assets "as is and in their present condition and state of repair." In doing so, WOC released and discharged "any and all claims at law or in equity, known or unknown, whether now existing or arising in the future, contingent or otherwise, against [Apache] with respect to any adverse environmental conditions," and expressly agreed to assume the risk, set out in all capital letters, "that the assets may contain waste materials, including naturally occurring radioactive materials, hydrocarbons, hazardous wastes, hazardous materials or hazardous substances, and that adverse physical conditions, including, but not limited to, the presence of unknown abandoned oil and gas wells, water wells, sumps and pipelines may not have been revealed by [WOC's] investigation."

Article 9.5, the PSA's primary indemnity provision, provided in all capital letters that from and after the closing date, Apache would indemnify WOC, its officers, directors, employees, and agents within a year of the closing for all losses, damages, claims, demands, suits, costs, expenses, liabilities, and sanctions of every kind and character, including reasonable attorney's fees, court costs, and costs of investigation arising from or in connection with the retained liabilities or any breach by Apache of the PSA. And it provided that from and after the closing date, WOC

6

SHALL DEFEND, INDEMNIFY, RELEASE AND HOLD HARMLESS [APACHE] AGAINST ALL LOSSES, DAMAGES, CLAIMS, DEMANDS, SUITS, COSTS, EXPENSES, LIABILITIES AND SANCTIONS OF EVERY KIND AND CHARACTER, INCLUDING WITHOUT LIMITATION REASONABLE ATTORNEYS' FEES, COURT COSTS AND COSTS OF INVESTIGATION, WHICH ARISE FROM OR IN CONNECTION WITH (i) ANY OF THE CLAIMS, COSTS, EXPENSES, LIABILITIES AND OBLIGATIONS ASSUMED BY [WOC] PURSUANT TO SECTION 9.4, OR (ii) ANY BREACH BY [WOC] OF THIS AGREEMENT.

The PSA's arbitration clause states,

11.12    Arbitration.    Any disputes arising out of or in connection with this Agreement or the application, implementation, validity, breach or termination of this Agreement shall be finally and exclusively resolved by arbitration in Houston, Texas pursuant to the dispute resolution provisions contained in Exhibit B. Notwithstanding the above, in the event a third party brings an action against [WOC] or [Apache] concerning this Agreement or the Assets or transactions contemplated herein, [WOC] and [Apache] shall not be subject to mandatory arbitration under this section and [WOC] or [Apache] shall each be entitled to assert their respective claims, if any, against each other in such third party action.

Exhibit B defined "Covered Dispute" as "[a]ny and all disputes concerning or arising out of the Agreement to which this Exhibit is attached." It set forth that unless the parties mutually agreed otherwise, if they were unable to resolve an arbitrable dispute pursuant to the PSA's dispute resolution procedures in Exhibit B, then the claimant had fifteen days after the parties reached an impasse to serve notice requesting that the dispute be submitted to binding arbitration "in accordance with the terms of this Appendix and the then current American Arbitration Association ('AAA') Rules for Arbitration of Commercial Disputes ('AAA Rules')." It also

7

provided that arbitration would be governed by the Federal Arbitration Act (FAA) and that the arbitration hearing would be held in Houston, Texas, "at a location designated by the arbitrator." And it provided that the arbitrator's decision would be final, binding, and nonappealable with regard to "grounds of error in the application of the law or the findings of fact."

### 2. The Apache Assignment

The assignment, conveyance, and bill of sale from Apache to WOC (the Apache Assignment), which "granted, sold, assigned, conveyed and delivered" the property covered in the PSA, was made "pursuant to and subject to all of the terms and conditions" of the PSA and listed the same effective date—"April 1, 2001, 7:00 A.M., local time"—as the PSA. Wagner executed the assignment on WOC's behalf on June 28, 2001.

### 3. Assignment from WOC to Wagner, Trade, and W&C

WOC, through H.E. Patterson, its senior vice president, assigned the assets to Wagner, Trade, and W&C (the WOC Assignment) on June 29, 2001, with the same effective date—April 1, 2001—as the PSA and Apache Assignment. Wagner signed for himself individually and on behalf of Trade as its vice president. Dean O. Cochran Jr. signed for W&C as its president.

The WOC assignment describes the Apache Assignment. It further states, "This Assignment is subject to all terms, provisions and conditions contained in the APACHE Assignment, and Assignees assume and agree to be bound by and perform

8

their proportionate parts of all obligations imposed upon [WOC] by the APACHE Assignment."

## C. Arbitration Demand

Apache was subsequently named as a defendant in five lawsuits in Louisiana; none of these lawsuits were brought by parties to the PSA. On November 20, 2017, Apache filed a demand for arbitration against Appellees with AAA, seeking to arbitrate the issue of whether Appellees owed it the $15 million that Apache had expended in the defense of those lawsuits, related litigation, and settlement costs.

## D. The Tarrant County Declaratory Judgment Action

On December 15, 2017,[4] Appellees filed a declaratory judgment action in Tarrant County, seeking declarations that, among other things, (1) Wagner, Trade, and W&C were not parties to the PSA and, accordingly, not subject to the PSA's indemnity and arbitration clauses, (2) Apache was not a third-party beneficiary of the WOC Assignment, (3) mandatory arbitration did not apply to a claim for defense and indemnity arising from a third-party lawsuit against either Apache or WOC related to the PSA or the assets or transactions contemplated in it, and such a claim had to be brought in the third-party lawsuit, (4) the Louisiana lawsuits brought by third parties

---

[4]Although Apache complains that Appellees started to participate in the arbitration process before filing their declaratory judgment action in Tarrant County, the record reflects that WOC objected to arbitrability and expressly refused to waive any of its objections when it selected its arbitrator eight days before filing its Tarrant County lawsuit. And the parties signed a rule 11 agreement in early January 2018 to reflect that by responding to Appellees' Tarrant County lawsuit, Apache was not waiving any of its rights or arguments relating to arbitration, venue, or jurisdiction.

against Apache and WOC concerned the PSA or the assets or transactions contemplated therein,[5] and (5) Appellees had no duty to defend or indemnify Apache or to arbitrate the dispute. Apache filed a motion to transfer the case to Harris County and a motion to abate and compel arbitration. Appellees filed an application to stay arbitration.

## E. Arbitration

In its motion to abate and to compel arbitration, Apache argued that because WOC had agreed that the arbitrator would decide issues of arbitrability, pursuant to the AAA Commercial rules, which were expressly incorporated into the arbitration agreement, the trial court was required to compel arbitration. Apache further argued that WOC's assignees were required to arbitrate because they had expressly assumed the arbitration obligations in article 11.10 of the PSA and because they had agreed to be bound by and perform all of WOC's PSA obligations in the WOC Assignment. Apache also contended that WOC's assignees were required to arbitrate under incorporation by reference and direct benefits estoppel theories.

In their response to Apache's motion to abate and compel arbitration, Appellees argued that the third-party-dispute exemption in the arbitration clause

---

[5]At the hearing on Apache's motion to transfer and Appellees' motion to stay, Wagner and WOC's counsel asserted that some of the plaintiffs in the declaratory judgment action were parties to all five of the Louisiana lawsuits but that not all of the plaintiffs were parties to all of the lawsuits, two of which had settled, two of which had been prevailed upon by Apache, and one of which was still pending. In response to the trial court's query, Wagner and WOC's counsel stated that there were no cross-actions in the Louisiana lawsuits between the parties to the instant case.

applied to their dispute and adopted and incorporated by reference the arguments in their stay application. They also argued that because Wagner, Trade, and W&C were nonsignatories to the PSA, the arbitration clause did not bind them.

## F. Hearing

On March 22, 2018, the trial court heard Apache's motion to transfer and Appellees' motion to stay the arbitration proceedings. Apache argued that the designation of Houston in the arbitration clause as the arbitration location, plus the provisions in civil practice and remedies code sections 171.096(a) and 15.020, meant arbitration had to occur in Harris County and that, despite the third-party actions, the arbitration clause applied. Apache also argued that the WOC assignment incorporated the arbitration clause when it was made subject to the PSA's terms and conditions.

Trade and W&C's counsel argued that the WOC Assignment did not contain an arbitration clause or extend the PSA's arbitration clause to them, that the WOC Assignment was not sued on by any party, and that they were not parties to the PSA. They further argued that venue was appropriate in Tarrant County because the PSA and WOC Assignment were negotiated there and that WOC and Apache had only agreed that certain disputes would be arbitrated, not that any dispute arising out of or in connection with the PSA must be brought in Houston.

Wagner and WOC's counsel argued that the arbitration should be stayed until they could get a declaration of what the arbitration agreement meant when the express

11

exception in the arbitration clause showed that the parties had never contemplated subjecting indemnity claims relating to third-party claims to the arbitration provision. He also argued that Apache had the burden to show that the issue of arbitrability was up to the arbitrator and that the arbitration clause was silent on that issue.

Apache's counsel responded that both conditions precedent in the arbitration clause—(1) a dispute arising out of the PSA and (2) a third party's suing Apache or WOC related to the PSA, assets, or transactions covered thereby—had to be met before the exception would come into play and that the broad "any disputes" language was clear and unmistakable evidence that the parties had agreed that threshold questions of arbitrability would be decided by the arbitrator, particularly when the AAA Commercial rules were incorporated into the PSA through the exhibit referenced in the arbitration clause.

## G. Trial Court's Orders

The trial court denied Apache's motion to transfer venue, granted Appellees a stay of arbitration, and denied Apache's motion to abate and compel arbitration. Apache appealed these orders. We filed the arbitration appeal in cause number 02-18-00132-CV and the venue appeal in cause number 02-18-00135-CV.[6] We subsequently consolidated these cases.

---

[6]Apache also filed a petition for writ of mandamus in cause number 02-18-00137-CV, which we denied on May 17, 2018.

12

In a letter ruling, the trial court elaborated that the exemption in the PSA's arbitration clause applied to the class of claims "referenced in th[e] second sentence" of the clause, i.e., third-party claims, precluding mandatory arbitration of the claims at issue. The trial court further determined that Apache had failed to establish clearly and unmistakably that the arbitrator, rather than the court, was to decide the "gateway matter" of whether a valid arbitration agreement existed.

## III. Arbitration

We review a trial court's denial of a motion to compel arbitration for an abuse of discretion. *Diligent Tex. Dedicated LLC v. York*, No. 02-17-00416-CV, 2018 WL 4140637, at *4 (Tex. App.—Fort Worth Aug. 30, 2018, pets. filed) (mem. op.) (citing *Legoland Discovery Ctr. (Dallas), LLC v. Superior Builders, LLC*, 531 S.W.3d 218, 221 (Tex. App.—Fort Worth 2017, no pet.)). But because unambiguous contracts are construed as a matter of law, *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014), we review de novo a trial court's determination regarding whether a valid agreement to arbitrate exists and its construction of an unambiguous arbitration agreement. *See In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding); *In re Guggenheim Corp. Funding, LLC*, 380 S.W.3d 879, 886 (Tex. App.—Houston [14th Dist.] 2012, orig. proceeding [mand. dism'd]); *see also Granite Re Inc. v. Jay Mills Contracting Inc.*, No. 02-14-00357-CV, 2015 WL 1869216, at *3 (Tex. App.—Fort Worth Apr. 23, 2015, no pet.) (mem. op. on reh'g).

13

As described by our supreme court, arbitration is a creature of contract between consenting parties. *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 629 (Tex. 2018). Who is bound by an arbitration agreement is normally a function of the parties' intent as expressed in their agreement's terms. *Id.* at 633. When relying on a contract to compel arbitration, the movant must first establish the existence of a valid and enforceable arbitration agreement and then must establish whether the claims at issue fall within the arbitration agreement's scope. *Id.*; *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (orig. proceeding). Doubts about scope are resolved in favor of arbitration, but the presumption favoring arbitration agreements arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists. *Kellogg Brown & Root, Inc.*, 166 S.W.3d at 737–38.

An arbitration clause is a "specialized kind of forum-selection clause," *Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 437 (Tex. 2017), and whether claims are covered by a forum-selection clause "should be [determined] according to a common-sense examination of the substance of the claims made." *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 677–78 (Tex. 2009) (orig. proceeding). To determine whether a claim falls within the scope of the agreement, courts must focus on the factual allegations of the complaint, rather than the legal causes of action asserted. *In re Rubiola*, 334 S.W.3d 220, 225 (Tex. 2011) (orig. proceeding); *see also In re Kaplan Higher Educ. Corp.*, 235 S.W.3d 206, 210 (Tex. 2007) (orig. proceeding) (stating that when an agreement between two parties clearly provides for the substance of the dispute to be

14

arbitrated, one cannot avoid it by simply pleading that a nonsignatory agent or affiliate was pulling the strings). Because forum-selection clauses are creatures of contract, the circumstances in which nonsignatories can be bound to one are rare. *Pinto Tech. Ventures, L.P.*, 526 S.W.3d at 443.

We review a contractual provision in light of the entire contract. *BBVA Compass Inv. Sols., Inc. v. Brooks*, 456 S.W.3d 711, 718–19 (Tex. App.—Fort Worth 2015, no pet.). That is, as the supreme court has instructed us,

> [w]e "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served," and avoiding unreasonable constructions when possible and proper. *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987). To that end, we consider the entire writing, harmonizing and giving effect to all the contract provisions so that none will be rendered meaningless. *Moayedi*, 438 S.W.3d at 7. No single provision taken alone is given controlling effect; rather, each must be considered in the context of the instrument as a whole. *Id.* We also give words their plain, common, or generally accepted meaning unless the contract shows that the parties used words in a technical or different sense. *Id.*

*Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015).

A contract is not ambiguous if its language can be given a certain or definite meaning. *Id.* But if the contract is subject to two or more reasonable interpretations after applying the pertinent contract principles, the contract is ambiguous, creating a fact issue regarding the parties' intent. *Id.* Mere disagreement over the interpretation of an agreement does not necessarily render the contract ambiguous. *Id.* Further, our primary concern is to determine the true intent of the parties as expressed by the plain

language of the agreement. *N. Shore Energy, L.L.C. v. Harkins*, 501 S.W.3d 598, 602 (Tex. 2016).

## A. Arbitration Agreement

We must determine whether Apache showed, under Texas contract law, that there was a valid agreement to arbitrate between it and Appellees.

### 1. Apache–WOC Agreement to Arbitrate

In the PSA, WOC and Apache agreed to arbitrate "[a]ny disputes arising out of or in connection with this Agreement or the application, implementation, validity, breach or termination of this Agreement . . . pursuant to the dispute resolution provisions contained in Exhibit B,"[7] and the Apache Assignment was made subject "to the terms and conditions" of the PSA. Accordingly, Apache showed that there was a valid agreement to arbitrate between it and WOC.

### 2. WOC Assignees

Determining whether a claim involving a nonsignatory must be arbitrated is a gateway matter for the trial court, not the arbitrator. *Jody James Farms, JV*, 547 S.W.3d at 629, 630 ("Who may properly adjudicate arbitrability is critical to ascertaining the appropriate standard of review.").

Contract language can extend enforcement rights to nonsignatories, such as when the arbitration agreement expressly provides that certain nonsignatories are

---

[7]Within this agreement, Apache and WOC carved out an exception, the applicability of which we address below.

considered parties to the agreement. *Pinto Tech. Ventures, L.P.*, 526 S.W.3d at 445. But the mere incorporation of AAA rules does not demonstrate a clear intent to arbitrate arbitrability as to a nonsignatory; rather, compelled arbitration cannot precede a judicial determination that an agreement to arbitrate exists in the absence of clear and unmistakable evidence that a party agreed to arbitrate arbitrability in disputes with nonsignatories. *Jody James Farms, JV*, 547 S.W.3d at 632–33.

The matter before us involves a <u>signatory</u> defendant trying to force <u>nonsignatory</u> plaintiffs into a forum not selected by the nonsignatory plaintiffs. There are six scenarios in which arbitration with nonsignatories may be required: incorporation by reference, assumption, agency, alter ego, equitable estoppel, and third-party beneficiary. *Id.* at 633 (referencing *Kellogg Brown & Root, Inc.*, 166 S.W.3d at 739). Apache argues that WOC's assignees are subject to three of these theories—assumption, direct benefits estoppel,[8] and incorporation by reference.[9]

---

[8]Under "direct benefits" estoppel, a nonsignatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens and may be compelled to arbitrate if he seeks to enforce the terms of a contract containing an arbitration provision, such as suing for breach of contract, breach of warranty, or revocation of acceptance based on the contract's written terms. *Kellogg Brown & Root, Inc.*, 166 S.W.3d at 739–40; *see Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 307 (Tex. 2006) ("When a party's right to recover and its damages depend on the agreement containing the arbitration provision, the party is relying on the agreement for its claims.").

[9]Documents incorporated into a contract by reference become a part of the contract when they do more than merely mention it. *See In re 24R, Inc.,* 324 S.W.3d 564, 567 (Tex. 2010) (orig. proceeding); *Bob Montgomery Chevrolet, Inc. v. Dent Zone Co.,* 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.). The language of the signed

17

Under the assumption scenario, an assignee may be held liable under another party's contract if it makes an express or implicit assumption of the contract's obligations. *NextEra Retail of Tex., LP v. Inv'rs Warranty of Am., Inc.*, 418 S.W.3d 222, 227 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (stating that while an implied assumption is disfavored, it may arise when the benefit received by the assignee is so entwined with the burden imposed by the assignor's contract that the assignee is estopped from denying assumption and the assignee would otherwise be unjustly enriched). And instruments pertaining to the same transaction may be read together to ascertain the parties' intent. *Fort Worth ISD v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000) (stating that such instruments may be read together "even if the parties executed the instruments at different times and the instruments do not expressly refer to each other").[10] The PSA, Apache Assignment, and WOC Assignment all pertain to

document must show that the parties intended for the other document to become a part of the agreement. *Bob Montgomery Chevrolet, Inc.*, 409 S.W.3d at 189–90 ("[T]he referring language in the original document must demonstrate the parties intended to incorporate all or part of the referenced document."); *see Gross v. WB Tex. Resort Cmtys., L.P.*, No. 02-12-00411-CV, 2014 WL 7334950, at *3 (Tex. App.—Fort Worth Dec. 23, 2014, no pet.) (mem. op.); *see also In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding) (holding that lease's jury waiver was incorporated by reference into guaranty agreement, which "plainly refer[red]" to the lease when guarantors agreed to "faithfully perform and fulfill all of [the] terms, covenants, conditions, provisions, and agreements" of the lease if the partnership defaulted).

[10]In *Fort Worth ISD*, the court read two Fort Worth ordinances and "contemporaneous, related documents" together as a valid agreement enforceable by the local school district, notwithstanding the city's argument that no single instrument reflected any agreement between the city and the school district. 22 S.W.3d at 834,

18

the same ultimate transaction—the purchase, sale, and conveyance of the oil-and-gas related assets and liabilities.

In the WOC Assignment, a separate agreement that did not involve Apache but that bore the same effective date and conveyed the same assets governed by the PSA and the Apache Assignment, WOC and the other Appellees agreed that their assignment was "subject to *all* terms, provisions and conditions contained in the APACHE Assignment," and that "Assignees assume[d] and agree[d] to be bound by and perform their proportionate parts of *all* obligations imposed upon Assignor by the APACHE Assignment." [Emphasis added.] The Apache Assignment, between Apache and WOC, was made subject to all of the PSA's terms and conditions. And the PSA itself, in article 11, which governed assignment, provided that the PSA would be binding upon and inure both to WOC and Apache "and their respective successors and assigns." Wagner, albeit in his corporate capacity, signed the PSA on June 4, 2001, and the Apache Assignment on June 28, 2001, giving him intimate familiarity with these documents' requirements before he signed the WOC Assignment in his personal capacity on June 29, 2001.

Based on the above, we conclude that the remaining Appellees are also subject to the PSA's arbitration clause. *Compare Rieder v. Meeker*, No. 02-17-00176-CV, 2018 WL 5074703, at *16 (Tex. App.—Fort Worth Oct. 18, 2018, no pet. h.) (mem. op.) 838–40 (observing that, as a matter of law, a court may determine that multiple documents comprise a written contract and that in "appropriate instances, courts may construe all documents as if they were part of a single, unified instrument").

(holding that forum selection clause was enforceable against nonsignatories who were managing board members of and closely related to a signatory because they were so closely related to the signatory that enforcement of the clause against them was foreseeable), *with Ball Up, LLC v. Strategic Partners Corp.*, Nos. 02-17-00197-CV, 02-17-00198-CV, 2018 WL 3673044, at *8 (Tex. App.—Fort Worth Aug. 2, 2018, no pet.) (mem. op.) (holding that a nonsignatory stranger to the contract with the forum selection clause could not enforce the clause against a signatory to attain personal jurisdiction over it in Texas). Accordingly, we do not reach Apache's other theories. *See* Tex. R. App. P. 47.1.

But our analysis does not end here. Apache also had the burden to establish that the claims in Appellees' declaratory judgment action fell within the scope of the arbitration clause.

## B. Arbitration Clause's Scope

The arbitration clause at issue applies broadly to any disputes "arising out of or in connection with [the PSA] or the application, implementation, validity, breach or termination of the PSA," with a carved-out exception. That exception states that notwithstanding the breadth of the first sentence's language,

> in the event a third party brings an action against [WOC] or [Apache] concerning this Agreement or the Assets or transactions contemplated herein, [WOC] and [Apache] shall not be subject to mandatory arbitration under this section and [WOC] or [Apache] shall each be entitled to assert their respective claims, if any, against each other in such third party action.

20

Apache argues that the carve-out only allowed Appellees to avoid arbitration if a third party filed suit related to the assets *and* Appellees filed cross-claims against Apache in the same third-party action. Apache complains that the trial court's interpretation rendered the phrase "in such third party action" surplusage.

Appellees respond that the carve-out's proper construction should be understood to mean that when the claim involves a third party and the assets, the PSA does not require arbitration, regardless of whether the issues are litigated in the third-party action or as a stand-alone lawsuit between Apache and Appellees.

For the exception to apply, a third party had to sue either Apache or WOC, raising some issue connected to the PSA, the assets, or "transactions contemplated" in the PSA. The record reflects that various third parties, in five Louisiana lawsuits, sued Apache, and that Apache, in turn, sought arbitration with regard to its breach-of-contract-based indemnity issues. The plain language of the last portion of the carve-out closes with a second reference to the third-party action.[11]

Considering both the language of the carve-out and the rest of the PSA to provide context for the arbitration clause, we read the carve-out as limited to cross-claims within a third-party action. *See Plains Expl. & Prod. Co.*, 473 S.W.3d at 305 (explaining that courts should construe contracts by giving effect to all of the

---

[11]Appellees argue that the language of the carve-out—such third-party action— "simply refers back to the two circumstances that define the parameters of the 'event' that triggers the carve-out sentence" and that the second clause is permissive. For the reasons set forth above and below, we disagree.

21

provisions and bearing in mind the business activity sought to be served); *see also Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 242 (Tex. 2016) (referencing "the fundamental principle that courts cannot rewrite the parties' contract or add to or subtract from its language"); *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010) (op. on reh'g) ("Courts strive to honor the parties' agreement and not remake their contract by reading additional provisions into it.").

We reach this conclusion not only by applying the plain language used in the PSA but also by taking a utilitarian view of the business activity sought to be served here. *See N. Shore Energy, L.L.C.*, 501 S.W.3d at 602 ("Our primary concern is to determine the true intent of the parties as expressed by the plain language of the agreement."); *Plains Expl. & Prod. Co.*, 473 S.W.3d at 305 (requiring contracts to be construed "from a utilitarian standpoint bearing in mind the particular business activity sought to be served"). The overriding theme of the PSA was for Apache to walk away from all but its specific retained liabilities, handing the potentially profitable assets to WOC in exchange for $25 million, an "as-is" sale with a sole remedy for any noncompliance by Apache with environmental laws available only before closing so that the parties could adjust the purchase price—"closing" here was meant as a cutoff date for the Article 6 remedies.[12] The parties agreed to a broad indemnification

---

[12]The PSA was effective April 1, 2001, signed June 4, 2001, and closed June 29, 2001. While closing is typically when assets are transferred, here, as noted above, "closing" had the additional significance of cutting off remedies with regard to adverse environmental conditions related to the assets.

provision, and it is clear from the PSA's plain language that Apache did not want any liability other than that which it specifically retained, not even for any damages sustained during WOC's inspection of the to-be-sold-"as is" assets. The parties also agreed to a broad, far-reaching arbitration procedure covering "[a]ny and all disputes" except for those involving engagement in any third-party actions. *See Nat'l City Mortg. Co. v. Adams*, 310 S.W.3d 139, 144 (Tex. App.—Fort Worth 2010, no pet.) (op. on reh'g) (observing that a defining characteristic of indemnification is that it does not apply to claims between the parties to the agreement but rather relates to liability claims of persons not party to the agreement); *see also Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995) (orig. proceeding) (reciting that the policy in favor of enforcing arbitration agreements is so compelling that courts should not deny arbitration "*unless it can be said with positive assurance* that an arbitration clause is *not* susceptible of an interpretation which would cover the dispute at issue" (quoting *Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990))); *S.P., III v. N.P.*, No. 02-16-00278-CV, 2017 WL 3821887, at *6 (Tex. App.—Fort Worth Aug. 31, 2017, no pet.) (mem. op.) ("A strong presumption favors arbitration, and courts resolve any doubts about an agreement's 'scope, waiver, and other issues unrelated to its validity in favor of arbitration. Unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue, a court should not deny arbitration.'" (quoting *BBVA Compass Inv. Sols.*, 456 S.W.3d at 718 (footnote omitted))).

Accordingly, we conclude that the trial court abused its discretion by denying Apache's motion to compel arbitration and sustain Apache's first issue. Because we sustain Apache's first issue, we do not reach its second issue on venue. *See* Tex. R. App. P. 47.1.

## IV. Conclusion

The trial court erred in its construction of the parties' arbitration agreement. Accordingly, we sustain Apache's first issue, vacate the trial court's order granting the stay of arbitration, and remand this case to the trial court to compel arbitration pursuant to the parties' agreement.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered: November 29, 2018